Dr. Joy HOCHSTADT, Plaintiff,

v.

**WORCESTER FOUNDATION FOR EXPERIMENTAL BIOLOGY, INC., et al., Defendants.**

Civ. A. No. 75–3617–M.

United States District Court,
D. Massachusetts.

Jan. 5, 1976.

Nancy Gertner of Silverglate, Shapiro & Gertner, Boston, Mass., for plaintiff.

John Taylor Williams and Judith Ashton, Haussermann, Davison & Shattuck, Boston, Mass., for defendants.

## MEMORANDUM on APPLICATION FOR PRELIMINARY INJUNCTION

FRANK J. MURRAY, District Judge.

Plaintiff alleges in her complaint that she has been discharged from her employment with the defendant Worcester Foundation for Experimental Biology, Inc. (Foundation), effective December 31, 1975, because of her opposition to Foundation's employment practices made unlawful by 42 U.S.C. § 2000e–1 et seq. She has begun proceedings before the Equal Employment Opportunity Commission (EEOC) challenging the

discharge, and she seeks injunctive relief here to maintain the status quo of her employment pending the outcome of the proceedings before EEOC.[1] Defendants have moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1), (6) and (7). The court deferred consideration of the motion to dismiss pending hearing of the application for preliminary injunction.

Certain facts are not in dispute, and will be summarized at the outset of the memorandum; other facts found by the court will be referred to hereafter in the discussion of the case.

Plaintiff entered the employ of the Foundation as a Senior Scientist under a contract which became effective January 1, 1972. On July 27, 1973 plaintiff filed complaints with the Massachusetts Commission Against Discrimination, and with EEOC, charging the Foundation with discrimination against her in salary and conditions of employment. She also filed a complaint with the Department of Health, Education, and Welfare, Office for Civil Rights, charging the Foundation with failing to implement an adequate affirmative action plan, and a complaint with the Department of Labor, Wage and Hour Division. On September 25, 1974 she filed a civil action in this court (Civil No. 74–4541–G) against the Foundation charging sex discrimination. That action was settled by payment of a sum of money to plaintiff and by her dismissal of all pending court and administrative proceedings. In April 1975, an academic evaluation of plaintiff placed her among the lowest 25% of scientists at the Foundation. In May 1975, she met with Dr. Ashton Gibbons, personnel and equal employment opportunity officer for the Foundation, and discussed with him her complaint about her evaluation. On June 9, 1975 written notice of the termination of her employment, effective December 31, 1975, was given plaintiff by the Foundation. She thereupon made a complaint to EEOC alleging that the discharge was a retalia-

---

1. The complaint contains a pendent count based upon an alleged breach of the plaintiff's contract of employment with the Foundation.

The court does not deal with this count because, in the present posture of the case, the plaintiff seeks only preliminary relief.

tion for her opposition to unfair employment practices, 42 U.S.C. § 2000e–3(a). She requested EEOC to seek preliminary relief in ner behalf. EEOC responded that its litigation backlog made such action impossible.

### The Motion to Dismiss

#### A.

The first three grounds of the motion[2] raise essentially the same point and will be considered together. Defendants contend that without a right-to-sue letter from EEOC plaintiff cannot invoke the jurisdiction of this court to seek a preliminary injunction to preserve the status quo of her employment. While such a letter is a jurisdictional requirement which must be met before the court can consider a discrimination claim on the merits, *see, e. g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798–99, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), this case presents only the question whether this court can grant relief to preserve the status quo until EEOC acts. Resolution of this question involves determining the intent of Congress from the statutory provisions and other relevant material.

Defendants contend the requirement of the right-to-sue letter also applies in a proceeding to obtain relief to preserve the status quo. The court has been made aware of only two reported decisions dealing squarely with this issue. *Collins v. Southwestern Bell Telephone*, 376 F.Supp. 979 (E.D.Okl. 1974); *Troy v. Shell Oil Co.*, 378 F.Supp.

1042 (E.D.Mich.1974), *appeal dismissed* as moot, 519 F.2d 403 (6th Cir. 1975). Both cases support defendants' position. Support for the plaintiff's position exists by way of dicta in several cases. *See, e. g., Berg v. Richmond Unified School District*, 528 F.2d 1208, at 1212 (9th Cir. 1975); *Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69, 72 (5th Cir. 1973), *cert. denied*, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974). These cases are not binding authority on this court, which consequently must seek an answer based on the intent of Congress.

The statutory scheme, 42 U.S.C. § 2000e–5(f)(1), (f)(2) (1974),[3] contemplates that EEOC "would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). The requirement that the aggrieved party receive the statutory notice before commencing a lawsuit serves the statutory purpose of encouraging conciliation. The purpose of the right-to-sue letter is to notify the complainant that his administrative remedies before EEOC have been exhausted, *Beverly v. Lone Star Lead Const. Corp.*, 437 F.2d 1136, 1140 (5th Cir. 1971), *Shaffield v. Northrop Worldwide Aircraft Services, Inc.*, 373 F.Supp. 937, 940 (M.D.Ala. 1974); *Harris v. Sherwood Medical Industries, Inc.*, 386. F.Supp. 1149 (E.D.Mo.1974), and EEOC should not issue the letter until it has completed its investigation and failed

---

2. The first three grounds of the defendants' motion are as follows:

"1. The complaint fails to state a cause of action upon which relief may be granted.
"2. Plaintiff has no standing to sue under Title VII of the Civil Rights Act of 1974 [*sic*] 42 U.S.C. § 2000e *et seq.*
"3. Plaintiff has failed to exhaust her administrative remedies."

3. The applicable portions of 42 U.S.C. § 2000e–5 read as follows:

(f)(1) . . . [I]f a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action under this section . . . or the Commission has

not entered into a conciliation agreement to which the person aggrieved is a party, the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved . . . .
(f)(2) Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission . . . may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge.
. . . .

to achieve an acceptable conciliation. *See Cleveland v. Douglas Aircraft*, 509 F.2d 1027–28 (9th Cir. 1975); *see also* 29 C.F.R. § 1601.25 (1974).

EEOC has an enormous backlog of cases. *See* H.R.Rep. 92–238, 1972 U.S.Code Cong. and Admin.News, 92d Cong., 2d Sess., pp. 2146–47; *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 848 n.25 (5th Cir. 1975). Many charges of discrimination cannot be processed until a considerable time after filing has passed. In many cases, the interest of the complainant will be protected only if the status quo is maintained pending the outcome of the proceedings. While EEOC may seek preliminary relief, 42 U.S.C. § 2000e–5(f)(2), in many cases, as here, it will be unable to do so. In such circumstances, the intent of Congress to eliminate unfair and discriminatory employment practices is best served by permitting the private employee to seek to preserve the status quo pending the outcome of the proceedings in EEOC. Requiring a right-to-sue letter would thwart this intent and therefore the court holds that a letter is not required in the present case. *See* Note, Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1257 (1971); Spurlock, Proscribing Retaliation under Title VII, 8 Ind.L.Rev. 453, 463–64 (1975).

Further, such resolution of this question is particularly appropriate in a retaliation case. Congress has chosen, in large measure, to rely upon the initiative of employees to challenge discriminatory practices. *See Alexander v. Gardner-Denver Co., supra*, 415 U.S. at 45, 94 S.Ct. 1011; *United States v. Allegheny-Ludlum Industries, Inc., supra* at 848. The willingness of an employee to oppose discriminatory practices would be dampened if he knew that, should his employer retaliate against him: (1) EEOC would not consider his complaint on the merits for as much as two years; (2) EEOC

would likely be unable to seek a preliminary injunction on his behalf; and (3) he would be unable to seek a preliminary injunction himself until at least 180 days had passed and he had obtained a right-to-sue letter. The solution to this dilemma is to permit employees to bring an action to maintain the status quo prior to the exhaustion of remedies before EEOC and the receipt of a right-to-sue letter.

■ The 1972 amendments to Title VII gave EEOC authority to seek preliminary relief in certain cases. The defendants contend that this grant of authority indicates a Congressional intent to bar private parties from seeking such relief while cases are pending before EEOC. *See Collins v. Southwestern Bell Telephone, supra; Troy v. Shell Oil Co., supra.* On the other hand, plaintiff claims that the 1972 amendments do not indicate an intent to preclude her from seeking a preliminary order in this case. *See Drew v. Liberty Mutual Insurance Co., supra.*[4]

It was established prior to the 1972 amendments that private parties who had a right-to-sue letter from EEOC were entitled to preliminary relief in appropriate cases. *See Culpepper v. Reynolds Metals Co.*, 421 F.2d 888 (5th Cir. 1970); *Rios v. Enterprise Association of Steamfitters*, 326 F.Supp. 198 (S.D.N.Y.1969). The legislative history of the 1972 amendments shows that Congress intended to leave the existing case law untouched in areas where the amendments did not specifically apply. *See* Sape and Hart, Title VII Reconsidered: The Equal Employment Opportunity Act of 1972, 40 Geo.Wash.L.Rev. 824, 846 (1972). The committee reports show a Congressional concern to increase EEOC's effectiveness in enforcing Title VII, and for the first time it was given authority to obtain preliminary injunctions. Congress did not intend to detract from existing private remedies. *Id.* This view of the amendments comports with the conclusion reached above

---

**4.** *Cf. Murry v. American Standard, Inc.*, 488 F.2d 529, 530–31 (5th Cir. 1973) where the court said that "a private individual may rightly claim statutory basis for obtaining a prelimi-

nary injunction in a Title VII suit." In that case, there is no indication that the plaintiff lacked a right-to-sue letter.

that the statutory scheme is best served by permitting the private employee to bring an action to maintain the status quo without first obtaining a right-to-sue letter. Accordingly, insofar as it rests upon the fact that the plaintiff herein has no such letter, the motion to dismiss is denied.

### B.

The second ground asserted for dismissal is the failure to join an indispensable party, EEOC. This issue is not briefed; presumably, the defendants would argue that failure to join EEOC will leave them exposed to a risk of incurring additional or inconsistent obligations if EEOC decides to seek preliminary relief. Fed.R. Civ.P. 19(a)(2)(ii). In weighing that likelihood the court regards the realities of the situation, not mere remote possibilities. 3A Moore's Federal Practice ¶ 19.07–2[1] at 2259–60 (2d ed. 1975). Since plaintiff seeks an order to preserve her status as an employee, no preliminary relief sought by EEOC would impose any greater burden. Also, there are letters from the District Director of EEOC appended to the affidavit of plaintiff's attorney which state that EEOC will not seek preliminary relief or seek to intervene in this litigation. Thus in reality, the defendants face no threat of additional or inconsistent obligations. Consequently, the failure to join EEOC is not a valid ground for dismissal.

### C.

The third ground asserted is that plaintiff's charge before EEOC named only the Foundation and therefore the complaint should be dismissed as to the individual defendants who are not named in the charge. The administrative complaint before EEOC was not introduced into evidence and the court therefore accepts the representation of the defendants that the complaint named only the Foundation.

The statute provides that " . . a civil action may be brought against the respondent named in the charge . . . ." 42 U.S.C. § 2000e–5(f)(1). The purpose for naming in the charge all persons who discri-

minated against the aggrieved party is to permit EEOC to attempt conciliation with those persons. The policy in favor of conciliation would be undermined if those persons not named in the charge, with whom no conciliation had been attempted, could later be sued. *See Williams v. General Foods Corp.*, 492 F.2d 399 (7th Cir. 1974). However, no policy would be served by an overly technical and restrictive reading of the requirements of Title VII. In this case, there was testimony that defendants Hoagland and Welsch were persons who discriminated against plaintiff and that they are the officers of the Foundation with whom EEOC would undertake conciliation efforts in due course. Thus, the policies of the Act will not be infringed by failing to dismiss defendants Hoagland and Welsch, *see Van Hoomissen v. Xerox Corp.*, 368 F.Supp. 829 (N.D.Cal.1973); *cf. Chastang v. Flynn & Emrich Co.*, 365 F.Supp. 957 (D.Md.1973), and the motion to dismiss on behalf of Hoagland and Welsch is therefore denied. The fact that the remaining defendants are members of the foundation's board of trustees does not necessarily imply an identity between them in their individual capacities and the Foundation. There was no testimony that any trustee other than Hoagland engaged in allegedly discriminatory acts toward plaintiff. Therefore, the complaint will be dismissed against the remaining defendants.

### Request for Injunctive Relief

#### A. *The burden of proof*

Plaintiff's claim is that she was discharged in retaliation for her opposition to the discriminatory employment practices of the Foundation. If such is the fact, her discharge violates 42 U.S.C. § 2000e–3(a) (1974), which in pertinent part provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, . . . assisted, or

participated in any manner in an investigation, proceeding or hearing under this subchapter.

To prove her claim, plaintiff must show by a preponderance of the reliable evidence that (1) she engaged in a protected activity as an employee, (2) she was subsequently discharged from employment, and (3) there is a causal connection between the protected activity and the discharge. *See, e. g., Tidwell v. American Oil Co.,* 332 F.Supp. 424 (D.Utah 1971); *Bradington v. International Business Machines Corp.,* 360 F.Supp. 845, 854 (D.Md.1973), *aff'd without opinion,* 492 F.2d 1240 (4th Cir. 1974). Ultimately the burden rests on plaintiff to prove the elements of her case, as in other civil actions. However, in allocating the order of proof and the burden of going forward the court must be mindful of the realities of the relationship between employer and employee, and of the intent of the Congress in employment discrimination cases to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification". *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Following the teaching of *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. 1817, where the Supreme Court articulated the concept of a shifting burden of proof in the context of a refusal-to-rehire case, the court concludes that in the case of an alleged retaliatory discharge the order and allocation of proof should be as follows. The employee must make out a prima facie case by showing (1) that she engaged in protected activity, i. e., she opposed unlawful employment practices or participated in Title VII proceedings, (2) that her employer was aware of the protected activities, (3) that she was subsequently discharged, and (absent other evidence tending to establish a retaliatory motivation) (4) that her discharge followed her protected activities within such period of time that the court can infer retaliatory motivation. Once the prima facie case has been demonstrated, the burden shifts to the employer to articulate a legitimate, nondis-

criminatory reason for the discharge. If a reasonable basis for the discharge is shown, the employee then has the opportunity to demonstrate by evidence that the reasons assigned by the employer were pretexts.

■ In *Tidwell v. American Oil Co.,* 332 F.Supp. 424 (D.Utah 1971), the court said plaintiff should prevail in a retaliation case if opposition to employment practices was the "principal reason" for the discharge. *Id.* at 430. However, in *McDonnell Douglas Corp. v. Green, supra,* the Court emphasized that "Title VII tolerates no racial discrimination, subtle or otherwise". *Id.,* 411 U.S. at 801, 93 S.Ct. at 1824. Similarly, Title VII tolerates no discrimination for participation in protected activities. Thus, if it is shown that retaliatory discrimination on the part of the employer contributed among other reasons to cause the discharge, there is a violation of the statute. *See Bradington v. International Business Machines Corp., supra.*

### B. *Likelihood of success on the merits*

#### I. *Prima facie case*

■ From the facts not in dispute summarized above, it is clear plaintiff has made out a prima facie case. She engaged in protected activities when she filed charges of sex discrimination with EEOC and the Massachusetts Commission Against Discrimination, and when later she brought a civil action to prosecute her claim of sex discrimination. She engaged in other protected activities when she initiated administrative proceedings before the Wage and Hour Division of the Department of Labor, and the Office for Civil Rights of the Department of Health, Education, and Welfare, and when she complained to Dr. Gibbons on May 2 about her academic evaluation. The scope of the words "opposed any practice made an unlawful employment practice" is broad enough to include initiation of administrative proceedings before agencies other than EEOC when the proceedings relate to claims of sex discrimination. Similarly, opposition includes using the employer's internal grievance mecha-

nisms. Since the administrative proceedings and the settled court action directly involved the Foundation, and the complaint to Dr. Gibbons was to an authorized Foundation officer, it is clear that the Foundation was aware of plaintiff's activities. Finally, plaintiff was given notice of her discharge within six months of the settlement of the civil action and the dismissal of the administrative proceedings, and about one month after she complained to Dr. Gibbons. The court is satisfied from the history and timetable of these events that it is reasonable to infer the discharge was causally related to them.

## II. *Reasons for plaintiff's discharge*

■ Turning now to the question of whether the Foundation has successfully met plaintiff's prima facie case, the court concludes that it has. The discharge letter of June 9, 1975 notified her that "your continuing lack of cooperation, disruptive influence, hostility and threats toward the Institution and its Directors have made such termination necessary". Defendants have articulated legitimate, nondiscriminatory reasons for the discharge, and each of the reasons assigned finds support in the evidence adduced and the facts found by the court. The decision to terminate plaintiff took place against a background of general conflict and specific instances of plaintiff's misconduct. Even before her employment commenced, events occurred which gave some inkling that troublous times might lie ahead. The background of the decision to terminate plaintiff is outlined and demonstrated in a recitation of the following facts.

The Foundation is a private, nonprofit institution with about 250 employees. Its scientists conduct basic research in the biological sciences. It has major programs in reproduction and endocrinology, neurobehavior, and cell biology. The cell biology program is aimed at understanding normal and abnormal cell growth, an understanding which may lead to more effective treatment or prevention of cancer. This program has a budget of approximately $1.8 million and is funded largely by a core grant from the National Cancer Institute. The principal investigator in whose name the grant was made is defendant Mahlon Hoagland, M.D., president and scientific director of the Foundation. The core grant began in 1971, and Hoagland began to recruit scientists with appropriate specialties to staff the program. Among other specialists, Hoagland sought a cell virologist, and he approached Harvey Ozer, M.D., a virologist, to join the Foundation's cell biology program. Plaintiff, a Ph.D. specializing in cell membrane function, was brought to Hoagland's attention as a scientist who might fit into the cell biology program by Dr. Ozer, her husband. She had worked at the National Institutes of Health (NIH), and was recommended by her supervisor there.

Believing plaintiff could contribute to the cell biology program, Hoagland decided to offer her a position. On September 1, 1971 Hoagland sent letters to Dr. Ozer, offering him a position as Senior Scientist at the Foundation at an annual salary of $24000, and plaintiff, offering her a Senior Scientist position at $18000 annually. These salaries reflected the needs of the Foundation. Both Dr. Ozer and plaintiff accepted the offers of employment on October 1. It was contemplated that Dr. Ozer and plaintiff would commence their employment in January 1972. Shortly after October 1, however, plaintiff complained that the salary of $18000 was discriminatory and illegal, and sought to renegotiate it.[5] The effort to renegotiate resulted, on December 13, 1971, in a "reluctant" offer by Hoagland to adjust the salaries so that plaintiff and Dr. Ozer would each receive $21000 annually. In the letter of December 13 agreeing to the revised salaries, Hoagland wrote:

> I hope most sincerely that this letter will close the matter of salaries and allow us to get on with the important matters of scientific productivity with good will

**5.** Plaintiff later admitted that among her reasons for claiming her salary discriminatory was the fact her husband would be paid a salary greater than hers.

and real commitment. This has been a most unfortunate and unpleasant interlude but I think we can now forget about it and work together for our common objectives.

Finally I would like to express our real appreciation to Harvey [Ozer] for being willing to make what appears to us to be a major concession for the sake of harmony.

From the inception of the cell biology program in 1971, periodic meetings of the cell biology group of scientists were held to discuss matters such as scientific goals, policies and recruitment. After joining the group in 1972 plaintiff interposed complaints concerning her personal grievances, and criticisms of the scientific directors, Hoagland and Welsch, the administration of the Foundation, and fellow scientists; she used the meetings as a forum for discussion of her own salary demands and her claim that the Foundation's affirmative action plan was inadequate. As a result of these disruptions, the purposes for which the meetings were called were interfered with, the members of the group were not able to carry on the discussions as planned, and the meetings were discontinued.

When plaintiff and Dr. Ozer had been at the Foundation about a year they submitted to Hoagland a memorandum concerning salary increases, a part of which involved a subsidy. They requested a total of $12000: $3000 each to adjust for the claimed increase in their living expenses in Worcester compared with their previous expenses in Washington, D. C., and for moving expenses to Worcester, and $3000 each to reflect a raise for the current year 1973. In March 1973 Hoagland notified plaintiff that the amount of her raise for 1973 was $1500, and expressed the hope that a larger increase would be made in the following year "when you've effectively joined the team".

Plaintiff's conduct at the Foundation in numerous instances caused conflicts with other scientists or disrupted their scientific activities. (a) She asserted to her colleagues that the Foundation had an inadequate affirmative action plan and warned that as a result individual scientists faced the cutoff of federal grants until government approval of an appropriate plan was obtained. This caused apprehension among the scientists since federal funding is the mainstay of scientific activity at the Foundation. To counteract this apprehension, on at least three occasions the directors invited an official of the HEW regional office in Boston to address the Foundation scientists to assure them that no cutoff of federal funding was contemplated. (b) Two research associates in plaintiff's laboratory, Drs. Raedar and Li, left the Foundation because plaintiff refused or declined to allocate to them appropriate responsibility and independence in the work of the laboratory. While problems existed in other laboratories occasionally, none of the problems approached the magnitude of those involving Raedar and Li. (c) Dr. Gut, a principal scientist, complained to Welsch on four occasions that plaintiff sought to elicit salary information from a graduate student in Gut's laboratory, and Gut requested Welsch to prevent plaintiff from making any such further attempts. (d) On numerous occasions plaintiff interfered with activities in Dr. Pederson's laboratory by complaining of the inadequacy of her salary and salary increments, and requesting Pederson to intercede with Hoagland on her behalf for larger salary adjustments. (e) In January 1975 Dr. Fairbanks complained that plaintiff had used research done in his laboratory for one of her grant proposals.

Several instances of dereliction of duty or breach of Foundation standards occurred in 1974 and 1975. (a) In 1974 Hoagland assigned plaintiff to head up the foundation's American Cancer Society's institutional grant application of $30000 for seed money to finance pilot projects which scientists might otherwise not undertake. Plaintiff's duty, among others, was preparation of the grant renewal application. Despite cautionary warnings, plaintiff delayed preparation of the application. The result was a poorly prepared application and denial of the grant renewal by the sponsor. There-

upon Hoagland appointed another scientist to revise and resubmit the application, which then was approved. (b) In December 1974 Hoagland sent a memorandum to plaintiff criticizing one of her grant proposals [6] in various respects. He pointed out that the bibliography in the application was misleading because it listed, in violation of Foundation policy, abstracts and unpublished articles.[7] Also in December, Welsch sent a memorandum to plaintiff correcting certain misstatements in the application. No grant proposal of any other scientist required similar corrective criticism or revision. (c) Welsch on several occasions called plaintiff's attention to her misuse of Xerox facilities, secretarial assistance and the foundation's telephone facilities. The telephone charges included approximately $167.00 for calls to plaintiff's attorney. No similar experience occurred with other scientists or employees of the Foundation.

Without consulting the directors of the foundation and having no authority to do so, plaintiff invited a newspaper reporter to inspect the Foundation's confidential salary data which she had acquired and assembled. This resulted in newspaper articles in the Worcester Telegram. Without consulting the directors of the Foundation and having no authority to do so, plaintiff invited Dr. Helene Guttman, an officer of Association of Women in Science (AWIS), to conduct an undisclosed affirmative action survey of the Foundation in April 1974 while Dr. Guttman was at the Foundation attending a scientific seminar. Following this visit Dr. Guttman wrote to Congressman Edwards a letter critical of the Foundation, challenging its good faith efforts to comply with the affirmative action regulations of HEW, and critical of HEW's handling of plaintiff's complaint against the Foundation of class action sex discrimination. Copies of this letter were sent to eight members of the Congress (Representatives and Senators), with no copy to the Foundation. Previous-

ly, in September 1973, plaintiff had discussed her employment relations with the Foundation with Dr. Guttman. During the discussion plaintiff had exhibited a draft affirmative action plan, which Welsch had submitted to plaintiff for her comments, and also confidential Foundation employees' salary information. Plaintiff communicated with Dr. Guttman on the Foundation's telephone, incurring charges which totalled almost $800.00 in 1973 and 1974. These charges were included in those about which Welsch had complained to plaintiff.

In April 1975 plaintiff met with Welsch, and during their discussion she accused Welsch of being Hoagland's office boy and hatchet man; she added that the Hoaglands would have to learn that they did not control the Foundation. In the discussion she demanded an increase of $2500 in salary because a salary support grant she had received from the American Heart Association had ended.

During the discussion with Dr. Gibbons on May 2, 1975, in which plaintiff complained to him of her academic evaluation and inadequate salary increment, she demanded that Gibbons take up the matter of her complaints with the Foundation's EEOC council. In an angry voice and language sprinkled with profanity and abuse, she warned that if Gibbons could not do his job by himself the law would make him do it.

On May 7, 1975, Welsch sent plaintiff a memorandum reviewing their April 23 discussion, and referring to plaintiff's meeting of May 2 with Gibbons, and notified her that henceforth all communications between the administration and plaintiff be reduced to writing. He had not sent to any other employee a similar memorandum at any time. On the following day plaintiff appeared at Welsch's office and said she wished only to discuss with him a scientific

---

6. This was the grant proposal which Dr. Fairbanks complained about in January 1975, referred to in the finding in the last sentence of the previous paragraph of this memorandum.

7. Foundation policy required scientists not to include in their bibliographies abstracts and articles in preparation, because that practice leads to the appearance of a "padded" bibliography.

proposal. Welsch replied he would discuss the scientific proposal but not other subjects. Plaintiff nevertheless reiterated her complaints about her evaluation and salary, added that she and Dr. Ozer could not remain on the same campus with Hoagland, and suggested that Welsch take her side of the controversy with Hoagland because that would be the winning side. During the discussion plaintiff said, concerning possible litigation with the Foundation, that she did not threaten to sue, "I promise a lawsuit".

There were occasions in 1973 and 1974 when Hoagland cautioned plaintiff that her frequent disruptions of the cell biology meetings, her tendency to undermine the administration in her relations with her colleagues, her constant complaints about her salary, and her threatening manner in her discussions with the directors might jeopardize her continued employment at the Foundation, and he urged plaintiff to desist her obstructive tactics and cooperate with the Foundation and her colleagues. In 1974 the trustees of the Foundation inquired of Hoagland why plaintiff should not be discharged, and Hoagland declined at that time to recommend discharge. The events in 1975 which precipitated the decision to terminate plaintiff were the plaintiff's abusive statements to Gibbons and Welsch, her threats of litigation made to Welsch, and her attempts to alienate Welsch from Hoagland and to pit Welsch against him. Hoagland and Welsch considered that these events demonstrated a renewal of plaintiff's disruptive and hostile manner and conduct, inimical to the Foundation, its directors and scientists, which she had manifested over a four-year period, and which had resulted in the suspension of the cell biology meetings, interruptions of the work of other scientists, her consuming the time of Hoagland and Welsch with her complaints so that they were not able to devote the required attention to other problems of the Foundation and their own scientific pursuits, and, by her unauthorized disclosures of Foundation's confidential matters, her injuring the Foundation and jeopardizing its fund-raising efforts. These are legitimate and appropriate reasons for termination of plaintiff's employment with the Foundation.

### III. The reasons for plaintiff's discharge were not pretexts

Plaintiff's view of her relations with the Foundation, and Hoagland and Welsch, is that she properly insisted on her rights as an employee from the outset of her employment, and resorted to legal action before administrative boards and the court when necessary; that Hoagland and Welsch responded to these efforts with unremitting hostility and they determined to discharge her because of her opposition to the Foundation's employment practices.

Plaintiff testified that she sought to renegotiate the Foundation's offer of employment at $18000 annually, which she had accepted, because she was advised, not by a lawyer but by another scientist, that the salary disparity between her husband and herself was illegal. That this was in fact her reason for her efforts to change the contract before she commenced her employment is not doubted, but there is no reason either to doubt that Hoagland closed the book on it at the time he agreed to the revised salaries. Regardless of plaintiff's sincere belief that she was discriminated against, it is clear to the court that Hoagland's offer of the original salaries was made in good faith and actually reflected the needs of the Foundation as Hoagland saw them.

In March 1973 Hoagland complained to plaintiff that he and Welsch were spending too much time on her salary demand. She testified that Hoagland remarked that she "could sue the Foundation and hurt it", but that he "could hurt me more and would find a way to do it". Hoagland's version of this meeting was that he spoke to her about "her threatening manner, her tendency to undermine the administration in her relationship with her fellow scientists, and her constant disruption of the activity of the cell biology group and related matters . . . I told her if this kind of activity continued we would have to consider termi-

nating her". I find Hoagland's version reliable.

Later in September 1973 at a faculty meeting at which plaintiff, Hoagland and Welsch were present, Welsch read from a paper which he had prepared in which he referred to "the absurdity of having to spend time on matters [arising] from the ludicrous actions of Joy". He also said ". . . I resent the garbage I had to *pour* out (part of it last night—I have not gone to bed yet since yesterday morning) to attempt to satisfy HEW. Not that it is garbage, but its importance is not more than that when you compare it to the problems we should devoting [sic] our efforts to. It is important to Joy! " Hoagland also read from prepared remarks in which he said ". . . we and our administrative staff have been constantly harassed by Joy and her complaints. Already she's set in motion irreversable [sic] processes that are going to sap more of our energies and are going to involve all of you more deeply—not to speak of our lawyer's time and time of consultants we've had to hire." The quotations in this paragraph from the papers of Welsch and Hoagland, which were in evidence, are excerpts only. Other parts of the papers refer to the problems of the Foundation and pleas to the scientists for their greater efforts. Each paper read in its entirety makes clear the genuine apprehension and concern felt by Welsch and Hoagland that plaintiff's conduct and tactics were threatening the Foundation's existence.

Plaintiff testified that on May 2, 1975 she met with Dr. Gibbons in his office, where she went for the purpose of lodging a formal complaint about her academic evaluation. She requested him to take up the matter as a formal complaint with the Foundation's equal employment opportunity council; that Gibbons replied that it would be better if the council did not handle her complaint because on a previous complaint the council had made recommendations which the administration had ignored; that it was his view that if the council championed her cause again and were ignored, the council's credibility would be undermined. She told Gibbons he had to do his job, and if he did not she would see that the law made him do it. She did not deny the likelihood of using profanity during the discussion. She admitted telling Welsch on May 8, 1975 that she and Dr. Ozer could not stand to be on the same campus with Hoagland, and that she might have said, with respect to a lawsuit, "I don't threaten; I promise".

■ Plaintiff's complaints can be viewed as her opposition to sex discrimination in compensation, or can be viewed as those of a disgruntled employee who feels she should be paid a salary at a higher rate, and who presents her complaints under the guise of a claim of sex discrimination. The hostility between plaintiff and Hoagland and Welsch stemmed partly from activities which were indirectly or directly related to her repeated allegations of unfair employment practices at the Foundation. Manifestly, any employee who opposes discriminatory practices may be viewed as hostile and disruptive by her superiors. The protection of Title VII, however, arises only when the termination results, wholly or partly, because the employee engaged in protected activities.

Title VII does not provide protection to an employee regardless of the adequacy of his job performance, and does not insulate an employee from the risk of termination of his employment by filing charges against the employer or opposing unfair practices. It is clear that Title VII does not guarantee continued employment. The Supreme Court pointed this out in the following language:

Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group.

*Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

**330**

■ The views of Dr. Robert Holley, a Nobel Prize scientist who administers a large cancer research program at the Salk Institute in California, that he regards plaintiff as a competitor of his in her field of research and that her work in progress is most significant, is entitled to considerable weight as regards her accomplishments as a scientist. Her curriculum vitae is impressive. It is true that Hoagland had great expectations of her when he decided to hire her. However, Hoagland was disappointed in her scientific performance, and on that basis did not rate her as a preeminent scientist at the Foundation. Dr. Holley's views that he would not terminate a scientist of plaintiff's caliber for the reasons ascribed by Hoagland and Welsch is quite another matter.[8] Dr. Holley had no first-hand knowledge of plaintiff's conduct. He had never visited the Foundation's properties at Worcester, worked with plaintiff, or acted in an administrative capacity over her. It is clear that the Foundation is entitled to establish its own nondiscriminatory standards of employee conduct and of performance. So long as it does not invidiously discriminate, the foundation may establish whatever personnel and performance standards it chooses, and the court should not substitute its judgment for that of the Foundation. *See Depperman v. University of Kentucky*, 371 F.Supp. 73 (D.Ky.1974).

The preponderance of the evidence establishes that plaintiff's attitude toward, and the performance of her, professional duties as a Senior Scientist appeared to be subordinated to her desire and efforts to change the administration of the Foundation. From the beginning and throughout her association with the Foundation it seems that the sense of calling to her professional and scientific goals never adequately took root. This dualism, the effort to perform adequately the duties for which she was employed and to grow in stature in her profession, and the effort to change or rearrange the Foundation's administration into the image she visualized for it, had a seri-

ously adverse effect upon the Foundation and its relations with the outside world, its administration, and its scientists. Focusing on the desire for achievement in the cell biology program, and the need to demonstrate to funding sources productivity and performance in that program in order that the Foundation might carry on, Hoagland and Welsch found themselves hard put to deal with plaintiff's demands. Welsch unwisely characterized as "garbage" the efforts he made in explanations to HEW, and has lived with that lapse ever since. Hoagland, however, demonstrated restraint in dealing with plaintiff as he warned her on several occasions that her continued departure from the Foundation's standards jeopardized her employment. Perhaps he was hoping the problem would "go away", even when in 1974 he declined to recommend to the trustees that she be discharged, and it was not until 1975 when he was satisfied that continued deviation from the Foundation's standards with potential harm to the Foundation could no longer be tolerated that he was moved to seek authorization for her discharge.

### C. *Conclusions*

Although plaintiff engaged in protected activities under Title VII, she was not discharged for this reason. The court finds that the articulated, legitimate reasons given by the Foundation, were not pretexts. Plaintiff has not demonstrated a likelihood of success on the merits. The motion for preliminary injunction is denied.

---

**8.** After Hoagland had employed plaintiff he learned from Dr. Stadtman, former supervisor of plaintiff when she was employed at NIH, of

difficult personality conflicts between plaintiff and other scientists at NIH.