**Reynold GORDON**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION a/k/a Amtrak.**

**Civ. A. No. 82–1064.**

United States District Court, E.D. Pennsylvania.

May 11, 1983.

Jerome L. Markovitz, Philadelphia, Pa., for plaintiff.

Theodore M. Kerrine, Associate Gen. Counsel, Amtrak, Nat'l RR Passenger Corp., Washington, D.C., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff Reynold Gordon ("Gordon"), a former employee of the defendant, National

Railroad Passenger Corporation ("Amtrak"), brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, contending that he was dismissed from his job as a pipefitter in retaliation for his previous complaints concerning Amtrak's hiring practices. Amtrak contended that Mr. Gordon was fired because he was insubordinate and failed to properly report an accident which could have been avoided had he followed his supervisors' instructions. Trial was held before this Court, sitting as a finder of fact, on April 18 and 19, 1983. For the reasons hereinafter set forth, the Court will enter judgment in favor of the defendant and against the plaintiff.

Based on the evidence presented at trial, the Court makes the following findings of fact: Plaintiff began working for the Penn Central Railroad in 1975. He started in the Wilmington repair shops of the railroad on August 23, 1975 as a laborer. In December, 1975, he became a pipefitter. In 1976, the Penn Central subsequently became, pursuant to the National Railroad Reorganization Act, a part of the Amtrak system.

At the Wilmington shops, Gordon and other workers performed repairs and general maintenance on Amtrak rail cars. Rail cars would be routinely rolled into the shops on tracks which led from the main rail lines into the shops. Once inside the shops, work would be performed on the cars. After repairs and maintenance were completed, the cars are returned to use on the main lines of the Amtrak system. As part of the repair process, the rail cars are routinely coupled together and uncoupled during movement to and from the shops.

On May 20, 1981, at approximately 8:00 a.m., Mr. Gordon and others were repairing Amtrak car No. 57 in the Wilmington shops. Mr. Gordon was on top of the car, performing his work when another car was to be moved into position to couple with the car on which Mr. Gordon was standing. Mr. Gordon was ordered to come down from the car so that he would not be hurt by impact between the cars. Robert Kanicki, the foreman of Mr. Gordon's work crew,

twice ordered plaintiff to come down. Max Mathes, the foreman of another work crew repairing the same rail car, also ordered Mr. Gordon down. Amtrak rules require that a workman such as Mr. Gordon obey the orders of both his own crew foreman and those of any other crew foreman. Ordinarily, when rail cars are being moved in the shop, a warning light and buzzer are activated. These warning devices were not working on the morning of May 20, 1981, however. There was some background noise in the repair shop, but it was not so loud that workers could not hear instructions from their foremen.

When the two rail cars coupled, Mr. Gordon was knocked down by the impact. He dismounted car No. 57, but did not report any injuries. He did not make any sort of accident report to Mr. Kanicki, his foreman, as required by the Amtrak rules. The following day, Mr. Gordon awoke with back pain. He arranged for a friend to transport him to his personal physician and instructed his daughter to call the Amtrak Wilmington shops and report that he would not be coming to work. Plaintiff's daughter, Donna Gordon, phoned Amtrak at approximately 10:00 a.m. Amtrak rules required that an injured worker personally report his injures as early in the morning as possible so that substitute labor could be arranged or so that the crew's work for the day could be revised to adjust to the missing worker's absence.

Plaintiff's doctor diagnosed plaintiff's injury as a sprained lower lumbar vertebrae. He prescribed a back brace, rest, and some therapy for Mr. Gordon. An Amtrak doctor substantially agreed with this diagnosis. Plaintiff was pronounced fit to return to pipefitting work in January, 1983, approximately 18 months after the accident. Mr. Gordon received disability payments from Amtrak until June, 1982. He did not return to work after the injury and did not file an accident report, as required by the Amtrak rules.

After the May 20 incident, a formal report of insubordination was filed concerning Mr. Gordon's conduct on May 20, 1981. The

matter was referred to an Amtrak Hearing Officer, who held a hearing and, on the basis of Mr. Gordon's repeated acts of insubordination on May 20, coupled with his failure to immediately report his injury and to properly report his absence the next day, recommended that Mr. Gordon's employment with Amtrak be terminated. Mr. Gordon was officially dismissed on July 2, 1981. On July 7, 1981, plaintiff appealed his dismissal to James Duncan, Amtrak district manager for labor relations, who reviewed the hearing officer's determination and refused to overturn Mr. Gordon's dismissal. Plaintiff later filed this suit.

Prior to the May 20 incident, Mr. Gordon had engaged in several acts which his supervisors considered insubordinate. On August 3, 1978, plaintiff was reprimanded by letter for refusing a superintendent's order to return to work when plaintiff was observed beginning work late because he chose to converse with another employee after being told to begin his work shift. In May, 1979, plaintiff was charged with insubordination for refusing a supervisor's order to perform a work task. After investigation, he was found to have been insubordinate, and was suspended from work for 30 days. He appealed the investigation's finding and suspension; he received an appeal hearing in June, 1979. The investigation findings and suspension were upheld but the suspension was reduced to 25 days. In May, 1980, Mr. Gordon received another letter of reprimand for being reported away from his assignment for 1 hour and 30 minutes. On May 13, 1981, one week before the May 20 incident which resulted in plaintiff's termination, he was reprimanded for calling Mr. Kanicki, his crew foreman, an "incompetent jackass" and telling Mr. Kanicki to "f____ himself" in response to a directive from the foreman.

Prior to the 1981 incident which gave rise to his dismissal, Mr. Gordon had complained to Amtrak officials about the corporation's procedures for selecting foremen. Specifically, plaintiff had contended that Amtrak's requirement that applicants for foreman positions submit "bids" for the job openings was overly bureaucratic. Mr. Gordon ex-pressed a desire to become a foreman but told Amtrak that he wished to apply by merely informing them of his interest in the open position. Amtrak officials who met repeatedly with plaintiff regarding this problem, informed the plaintiff that all available foreman positions were posted on a public bulletin board at the Wilmington shop. When such postings were made, Mr. Gordon was informed that he could formally apply for the open position merely by completing "bid" forms available from Amtrak and submitting them to either his supervisor or the shop's general manager. A "bid" in Amtrak jargon simply means a properly completed and filed application form. Plaintiff was repeatedly told that in order to be considered for a foreman's position, or any other job promotion at the Wilmington shops, he must submit a bid for the available position. Despite these clear instructions, Mr. Gordon did not submit a bid for a foreman's position at any time during the 6 years that he worked at Amtrak's Wilmington shops.

Apparently, during the course of 1978 meetings with Amtrak officials, Mr. Gordon stated that he considered the bid requirement racially discriminatory. He at that time noted to the shop supervisors that very few of the shops' foremen were black. Thereafter, the record contains no evidence that Gordon ever accused the shop management of Amtrak of racially discriminatory hiring practices. His complaints to Amtrak appear to be based upon Gordon's allegations that Amtrak's procedures were bureaucratic and it appears that his primary purpose was to obtain promotion to a foreman's position.

Plaintiff has filed this Title VII claim alleging that he was fired in retaliation for his earlier actions in support of his statutory right to non-discriminatory employment treatment. The testimony presented at trial showed that the plaintiff was advocating his own advancement to foreman in his dealings with Amtrak officials. However, Mr. Gordon, who is black, contended that Amtrak's bid procedures for job openings had resulted in few blacks becoming Am-

trak foremen. The Court, therefore, determined that Mr. Gordon had stated a prima facie case of retaliation based upon his criticisms of the system, which he initiated in 1978. However, on the basis of the evidence presented at trial, the Court finds that, although Mr. Gordon was a competent pipefitter who desired to become a foreman, he consistently refused to follow Amtrak's job application procedures and frequently disobeyed the orders of his supervisors. The Court finds by a preponderance of the evidence that he was dismissed from his job because of his acts of insubordination and not because of any discrimination or retaliation prohibited by Title VII.

■ In order to prevail in a suit brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, the plaintiff in this case had to first establish a prima facie case of discrimination or retaliation. If the plaintiff sets forth such a prima facie case, the defendant must "articulate some legitimate, non-discriminatory reason" for its decision(s) adverse to the plaintiff.

■ Once the defendant proceeds with its burden of production to rebut plaintiff's prima facie case, the plaintiff, who has the burden to convince the trier of fact, by a preponderance of the evidence, may then rebut the defendants' proffered reason for its decision by showing that it was merely pretext for discrimination or retaliation. *McDonnell Douglas v. Green,* 411 U.S. 792, 800–02, 93 S.Ct. 1817, 1923–24, 36 L.Ed.2d 668 (1973). Though *McDonnell Douglas* set forth this three-part procedure of shifting production burdens in a Title VII race discrimination case, the *McDonnell Douglas* approach is equally applicable to a claim of retaliation for protected Title VII activity, *see Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980); *Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779, 781 (9th Cir. 1976); *Hochstadt v. Worcester Foundation,* 425 F.Supp. 318, 324 (D.Mass.) *aff'd,* 545 F.2d 222 (1st Cir.1976).

■ Although discrimination cases can be usefully analyzed in terms of the three-phase framework set forth in *McDonnell Douglas v. Green, supra,* "there is no requirement that the evidence be introduced in such a compartmentalized form." *Worthy v. United States Steel Corporation,* 616 F.2d 698, 701 (3d Cir.1980). Plaintiff's evidence relevant to the question of pretext can be presented as part of the initial evidence going to the prima facie case itself or it may be developed during the other party's case in chief, such as by cross-examination. *Id.* at 701; *Whack v. Peabody & Wind Engineering Co.,* 595 F.2d 190, 193 (3d Cir.1979). The plaintiff, however, always has the burden of persuasion. *Texas Department of Community v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). *See also Beckler v. Kreps,* 541 F.Supp. 1311, 1316–17 (E.D.Pa. 1982).

> As the Supreme Court recently observed, The prima facie case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."

*United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1982) quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). As the *Aikens* court noted, "[t]he 'factual inquiry' in a Title VII case is 'whether the defendant intentionally discriminated against the plaintiff.'" —— U.S. at ——, 103 S.Ct. at 1482, quoting, *Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1094.

■ In this case, it is clear that Mr. Gordon was not the victim of intentional racial discrimination nor was he the victim of retaliation for his earlier complaints concerning Amtrak hiring and promotion practices. The evidence shows that Amtrak discharged Mr. Gordon for a valid, nondiscriminatory reason, his failure to follow instructions and company rules in connection with the accident on May 20, 1981. This basis

for his discharge was not a pretext for discrimination. The evidence further shows that Mr. Gordon was discharged solely because of his behavior relevant to the May 20, 1981 incident and not because of his exercise of Title VII rights.

It is worth noting that Mr. Gordon claims to have engaged in activities protected by Title VII during 1978 and 1979 and his dismissal in 1981 was in retaliation for these 1978 and 1979 activities. The record, however, is devoid of any evidence connecting his dismissal for insubordination with any civil rights activities by the plaintiff. *Cf. Goff v. Continental Oil Co.,* 678 F.2d 593, 599 (5th Cir.1982) (probation one month after protected activity and termination three months after protected activity show employment action adverse to plaintiff but does not, standing alone, show causal connection between civil rights actions and discharge sufficient to constitute retaliation). Furthermore, there is no evidence showing that the hearing officer who made the decision to terminate the plaintiff for insubordination had any knowledge of the plaintiff's civil rights activities during 1978 and 1979. In addition, as testified by Mr. Nathan Faucett, Amtrak senior director for human resources, internal complaints, such as those pursued by Mr. Gordon in 1978 and 1979, are treated in confidence and it is only in the event that fellow employees are brought into an investigation that they would learn of the existence of such complaints. This Court was presented with no credible evidence that anyone who testified against Mr. Gordon at the insubordination hearing did so in retaliation for his Title VII complaints.

Plaintiff's complaint in this case originally alleged only a violation of Title VII (Complaint, Dkt. No. 1, at 3). In the portion of the pretrial order completed by plaintiff's counsel, however, plaintiff's statement of the law applicable to the case averred that defendant's actions also violated 42 U.S.C. § 1981 and the Pennsylvania Human Relations Statute, 43 P.S. § 951, *et seq.* At trial, defendant moved to strike these contentions from the pretrial order, arguing that plaintiff could not add additional legal contentions after the close of the pleadings and discovery. The Court reserved decision on defendant's motion but will now enter an Order granting the motion.

■ The state human relations act is similar to Title VII in that it makes it unlawful for an employer to discriminate against an employee because of the employee's exercise of his rights under the state act. One of those rights is the right to be free from racial discrimination in the workplace. *See* 43 P.S. § 955(d). Complaints of discrimination in retaliation must, under the state scheme, be submitted to the Pennsylvania Human Relations Commission. The Commission is empowered to hold hearings and where discrimination is found, issue appropriate injunctive orders. The remedies available to the Commission (*e.g.,* reinstatement, payment of back wages, promotion) are nearly identical to those available to the federal district courts in Title VII cases.

However, the state statute requires that "Any complaint filed pursuant to (the state act) must be so filed within ninety days after the alleged act of discrimination." 43 P.S. § 959. Plaintiff's complaint in this litigation was filed on March 10, 1982, more than 90 days after both plaintiff's termination (July 2, 1981) and the date on which his supervisors cited him for insubordination (May 20, 1981). Furthermore, plaintiff has yet to file a complaint with the state commission. Until he has exercised his state law remedies, Mr. Gordon cannot ask this Court to apply the state statute under the principles of pendent jurisdiction. Furthermore, even if plaintiff has filed a timely complaint with the state agency, this Court would likely decline to exercise its discretion to hear pendent state law claims where the state statute provides the plaintiff exactly the same or fewer remedies than those available to him under the federal statute (Title VII). In addition, plaintiff cannot inject new legal arguments into litigation so late in the development of the case. The Court will therefore strike Mr. Gordon's state law claims for the reasons

heretofore set forth, and for the further reason that he has not shown that he was terminated for discriminatory or retaliatory reasons.

There is a compelling reason to strike Mr. Gordon's § 1981 claim—the legal standards and remedies of § 1981 are significantly different than those of Title VII. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (Title VII and § 1981 remedies are distinct but not mutually exclusive). Under these circumstances it would be unfair to require Amtrak to defend against these claims pleaded so late in the litigation unless a continuance were granted to permit further discovery. In the instant case, where the new legal questions injected into the case by the plaintiff on the eve of trial are so distinct from those pleaded in the complaint, the Court would be well within the bounds of its discretion to refuse to allow plaintiff to present these legal issues, even if defendant were granted additional time to prepare its case.

■ As the cases make clear, "Title VII and Section 1981 are not identical.... The proof is different, at least as to discriminatory intent." *Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968, 971 (10th Cir. 1979). To prove liability under Section 1981, a plaintiff must show a racially discriminatory purpose in the defendant's actions. *See Washington v. Davis,* 426 U.S. 229, 238–39, 96 S.Ct. 2040, 2046–47, 48 L.Ed.2d 597 (1976). A defendant may be liable under Title VII, "solely on the racially different impact of the challenged hiring or promotion practices." *Id.* at 238–39, 96 S.Ct. at 2047. While disparate impact is admissible evidence in a Section 1981 claim (*Id.* at 239, 96 S.Ct. at 2047), disparate impact standing alone will not create liability under Section 1981 and the Fourteenth Amendment of the Constitution. Furthermore, the reach of Title VII liability is greater. Section 1981 does not apply to discrimination on the basis of gender, religion, or national origin, as does Title VII. *See Manzanares, supra,* 593 F.2d at 971.

Although Title VII liability is broader than Section 1981 liability, the remedies available to the successful litigant are greater under Section 1981 than under Title VII. Back pay awards are available to victims of job discrimination under both Title VII and Section 1981, but under Title VII, the award may not exceed two years back pay. *See Johnson v. Railway Express, supra,* 421 U.S. at 460, 95 S.Ct. at 1720. Punitive damages are available under Section 1981 where the defendant's conduct has been outrageous, but Title VII permits recovery only of compensation in the equitable form of back pay and attorney's fees. *Id.* at 460, 95 S.Ct. at 1720. Attorney's fees are available under both statutes since the 1976 enactment of 42 U.S.C. § 1988, but prior to that Title VII contained a counsel fees provision. As originally enacted, Title VII did not apply to federal government discrimination. This was changed by amendment in 1972 (*see* 42 U.S.C. § 2000e–16). Section 1981 has applied to government discrimination for more than a century. In addition, Title VII not only creates a cause of action but also establishes an involved administrative scheme for combating discrimination while Section 1981 creates only a private right of action for unconstitutional discrimination.

■ Thus, the differences in the statutes require that a plaintiff seeking recovery under both laws plead both statutes in his complaint or seek to amend the complaint to include both bases of relief as soon as possible. This Court will not permit litigants to attempt to add Section 1981 claims to a Title VII case so late in the litigation as the filing of the pretrial order, which often is submitted by the parties only a week prior to the trial. In this case, if Gordon had shown discrimination, his remedies would have been defined by Title VII and not both Title VII and Section 1981. However, since Mr. Gordon has shown no such discrimination, he is not aggrieved by counsel's untimely attempt to add Section 1981 and 43 P.S. § 951 into the case. Under the facts as found by this Court, Mr. Gordon has not shown he is entitled to

relief under Title VII, Section 1981, or 43 P.S. § 951.