Emmett DOE, Jr.

v.

**AFL–CIO, DEPARTMENT OF ORGANIZATION, REGION 6, ATLANTA, GEORGIA.**

Civ. A. No. C 74–10A.

United States District Court, N. D. Georgia, Atlanta Division.

Dec. 17, 1975.

Laughlin McDonald, Atlanta, Ga., for plaintiff.

David W. Crosland, Atlantá, Ga., and Cooper, Mitchel & Crawford, Birmingham, Ala., for defendant.

## ORDER

JAMES C. HILL, District Judge.

This case having come on for hearing before the Court and after hearing the evidence and upon consideration of the materials submitted, the Court finds as follows:

1. Plaintiff Emmett Doe is a Negro citizen of the United States and is over the age of 21 years. At the time of the filing of this lawsuit he was a resident of Atlanta, Georgia.

2. Plaintiff commenced this action by filing his complaint on January 3, 1974, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. He seeks declaratory judgment, injunctive relief, reinstatement, back pay, damages and attorney's fees.

3. The defendant AFL–CIO is an organization of affiliated trade unions. The mission of its Department of Organization, Region 6, is to aid and assist affiliates in their organizing efforts and to institute organizing efforts upon its own initiative.

4. Not having a black organizer upon its staff and desiring to add such a person to assist in the organization of black workers in the South, the defendant interviewed a number of prospective trainees during February, 1968. Plaintiff was one of the persons interviewed.

5. Oliver Singleton, the Director of the Department of Organization, Region 6, indicated that he had strong leanings toward hiring plaintiff.

6. Plaintiff was appointed a temporary organizer on the staff of Region 6 effective March 24, 1968, upon the recommendation of Singleton, for a period not to exceed 90 days.

7. Consistent with defendant's desire to organize black employees, Singleton instructed plaintiff by memo dated April 11, 1968, that he should attempt to organize a number of plants within the metropolitan Atlanta area which had a significant number of blacks employed or where blacks formed a majority of the work force.

8. On May 23, 1968, Singleton recommended to W. L. Kircher, Director of Organization, AFL–CIO, Washington, D. C., that plaintiff's appointment be extended for an additional period of 90 days. While expressing some reservations about his recommendation, Singleton also expressed his admiration for plaintiff with regard to his strong convictions on the deficiencies of society and the role of the trade union movement.

9. Doe was notified by Kircher on May 27, 1968, that his appointment as a temporary organizer had been extended for 90 additional days.

10. Then, by letter dated September 4, 1968, Singleton recommended to Kircher that plaintiff be employed permanently as a field representative of AFL–CIO. Singleton again noted that while plaintiff was often critical of the racial policies of some unions, he felt that plaintiff could still be an effective organizer.

11. Accordingly, plaintiff was given the job and regular appointment as an AFL–CIO field representative effective September 20, 1968.

12. Singleton received complaints about plaintiff from several officials of unions affiliated with AFL–CIO to which plaintiff had been assigned for organizing campaigns. Uniformly, these officials objected to plaintiff's style and language, and requested that plaintiff not be assigned to any more of their organizing campaigns.

13. Plaintiff was during this time also commended for his organizing efforts by other union officials.

14. Plaintiff often expressed his belief that the AFL–CIO and its affiliates were not responding to the needs of black workers, that the union movement historically had been insensitive to the needs of black workers, that blacks tended to be exploited by unions for membership purposes, that blacks had been excluded from the union elective process and leadership positions and, that black workers should seek active roles in union affairs. Plaintiff also expressed his view that the AFL–CIO leaders were regressive and lacked social awareness to the problems of black workers. (These expressions were made by plaintiff in talks to and conversations with black workers sought to be persuaded to vote in favor of union membership.) Reports received by Singleton indicated that such were viewed as detrimental to organizing efforts.

15. Plaintiff submitted an expense report for late April and early May which indicated performance of activities on a day when information available to his supervisor indicated he was in Atlanta on that day, rather than Valdosta. When asked to substantiate his work activities for that day, he failed to do so.

16. Plaintiff was dismissed from employment by defendant on July 7, 1969.

17. Plaintiff was terminated from his employment because he failed to follow instructions given to him by his supervisor; he did not work in harmony with some AFL–CIO staff; he submitted apparently inaccurate activities reports; and he committed actions which were injurious to union organization activities.

18. Plaintiff filed a complaint with EEOC on August 13, 1969, alleging that his dismissal had been in violation of Title VII of the Civil Rights Act of 1964.

19. On April 2, 1973, EEOC concluded that there was reasonable cause to believe that defendant had engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964 by discharging plaintiff because of his race and opposition to practices made unlawful by Title VII.

20. On October 6, 1973, plaintiff was advised by letter dated October 4, 1973, that defendant's compliance with Title VII had not been accomplished within the period allowed to the EEOC by Title VII and that he was entitled to institute a civil action in the appropriate federal district court within 90 days of receipt of said letter. This lawsuit was commenced within the 90 day period on January 3, 1974.

CONCLUSIONS OF LAW:

This Court has jurisdiction over this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f), and 28 U.S.C. § 1343. The plaintiff is a black citizen of the United States. The defendant is an employer within the meaning of 42 U.S.C. § 2000e(b), and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(h).

Plaintiff contends that he was dismissed because of his opposition to practices made unlawful by Title VII.

Section 704(a), 42 U.S.C. § 2000e–3(a), provides in part:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, asserted, or participated in any manner in an investigation, proceeding or hearing under this subchapter."

The plain purpose of Title VII is to assure equality of employment opportunities and "to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). The Civil Rights Act does not command that any person be hired or retained simply because he is a member of a minority group. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

In this case plaintiff charges that he was fired because of his statements and opposition to discriminatory practices of AFL–CIO and its affiliates and because of his race. The defendant denies that its decision to fire plaintiff was based upon either of these reasons. The Court agrees with the defendant.

■ The plaintiff has the burden of establishing a prima facie case of discrimination. Once a prima facie case is established, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge. *McDonnell Douglas Corp. v. Green, supra.* There has been no attempt to show by way of a statistical case or otherwise that the defendant has engaged historically in discriminatory employment practices.

The issue in this case narrows down to "Why was plaintiff discharged by the defendant"? In deciding this question the reasons expressed and motives underlying the recommendations of Singleton are crucial. Of course, the Court is mindful that such an inquiry entails an analysis of "subjective intent" or "motive" and should not be allowed to mask the sort of discrimination prohibited by Title VII.

■ This being the case, a great deal of the evidence that might otherwise be considered hearsay is transferred into direct evidence. In other words, a good deal of testimony was taken as to what Singleton was told by officials of affiliate unions with regard to plaintiff's performance as an organizer. Such would be hearsay if the Court were trying to determine the truth or falsity of those reports. However, it is direct evidence of the information available to Singleton and upon which he acted. The Court's job is not to find out whether or not plaintiff carried weapons or whether he in fact falsified his expense statement for May 5, 1969. The Court must determine if Singleton recommended plaintiff's discharge because of his race or because of other activities protected by Title VII or for some legitimate reason. If the discharge was for a lawful reason, even though defendant acted impulsively or on bad advice, then the defendant has not violated Title VII.

Along the same lines, the Court is also not required to decide whether or not defendant was wise in discharging the plaintiff. Plaintiff may have been the best organizer that the defendant ever had. It may be that his approach to organizing workers—and particularly black workers—would have proven more effective in the long run than Singleton's approach. But Singleton was plaintiff's superior and it does appear that plaintiff refused to carry out Singleton's directions, feeling that his approach was often better. There is no constitutional or statutory prohibition against discharging an employee because he fails to carry out his employer's directions, even though the employer's directions may produce less effective results.

There is evidence in the record that plaintiff performed very well in some of

his tasks. There is evidence that plaintiff did a very good job on several organizing campaigns. However, at least five affiliate unions found his performance to be so ineffective and counterproductive that they requested that he never be assigned to their campaigns again. Here again, it is not the function of the Court to substitute its conclusions as to the plaintiff's effectiveness as an organizer for the conclusions of management, provided those conclusions are not a mere pretext to cover a discharge based upon race or protected activity. Furthermore, at the time that Singleton recommended that plaintiff be discharged, it is undisputed that he had very little communication from affiliate unions favorable to the plaintiff. Singleton might have found a favorable attitude had he cast about among all of those directing organizing campaigns on which the plaintiff had worked, but there is no evidence that he did so. Therefore, it seems clear that at the time Singleton made his recommendation, he had before him the negative reactions of about five affiliate unions and almost no positive recommendations or endorsements of plaintiff's efforts at all.

Two things to which the plaintiff testified evidence at least the probability that he would be an unsatisfactory labor union organizer. The function of an organizer is to sell. A salesman must, himself, be sold on his product.

Plaintiff testified that not only was he not 100 per cent sold on the "product" i. e., trade unionism, but that he positively expressed to prospective members on numerous occasions during organizing drives that he had a negative feeling about trade unionism for black employees. Gratuitously, it might be observed that self-criticism is often a useful practice for any organization. It may be that a critical person on the staff of a union would be of tremendous assistance to the union in adjusting its policies to insure that its goals are accomplished. Management may or may not be inclined to obtain the services of such an employee. However, it does appear that the very last place that one would want such an employee to be assigned would be to the sales force; i. e., an organizer. It is difficult to believe, that a person who feels that the union is not good for black employees could be a very effective salesman of the benefits of union membership to black employees. At least such a conclusion is not totally irrational and, even if erroneous, not unlawful. Federal law does not require an employer to exercise unquestioned wisdom in all of its decisions.

Further, plaintiff candidly and unequivocally stated on at least two occasions that his loyalty to his employer was limited. Plaintiff's first loyalty was to the black movement; i. e., to the welfare of blacks. Plaintiff stated that he was loyal to his employer unless he felt that some policy of the union conflicted with his primary loyalty to black people. Thus, plaintiff's position seems to be that he has a mission to improve the lot of black people; that he had a job paying him a salary to deal with black people; and that, therefore, he was subsidized to pursue his primary mission in life under a binding contract that made it impossible for the provider of the subsidy; i. e., his employer, to withdraw it so long as no one could forbid him from engaging in his primary mission. The Court does not find this to be the law.

Indeed, there are probably people who sincerely feel that all labor unions should be abolished. These people are constitutionally guaranteed the right to express their feelings. However, if they are on the payroll of a trade union as an organizer, and if—secure in that position—their statements to prospective union members are derogatory toward trade unionism, it is no violation of their constitutional or statutory rights to discharge them from that particular job. An employer is not a "sponsor" of the philosophy of his employee, even though our Constitution and laws guarantee to everyone the right to hold and espouse his own philosophy. An employer "sponsors" his employees to carry out the duties of their jobs according to the di-

394

rections of management. If those directions appear subjectively to conflict with an employee's philosophy, he is put to the hard task of compromising his beliefs or giving up his job.

The peculiar aspects of this case are that the philosophy of the plaintiff deals with race-related matters and some of his statements tended to criticize the union movement for its alleged failure to recognize and promote the interests of blacks. These beliefs of the plaintiff are certainly protected and the plaintiff could not be discharged for holding and espousing them. However, suppose the plaintiff were employed to punch holes in metal plates on an assembly line. Suppose further that the plaintiff strongly believed that his employer had practiced discriminatory policies in the past and adamantly expressed his beliefs to his fellow workers on the job. The Court is of the opinion that plaintiff could not be discharged from his job for holding and expressing his beliefs whether valid or invalid.

■ However, should the plaintiff be so persistent or get so caught up in his beliefs that he could no longer do his job effectively; e. g. he punched holes in the wrong place or his performance rate decreased, then his employer could lawfully discharge him for these failings. His employer could not discharge him because he advocated a position contrary to his employer's, but because his protected beliefs and actions made him ineffective as a hole-puncher.

■ Thus, the plaintiff in this case was hired by the defendant to organize workers. However, because the plaintiff was not himself 100 percent sold on unionism, and because his primary mission in life sometimes conflicted with his job, he was not an effective worker and refused to follow the instructions of his superior. Coupled with the facts that his employer suspected him of submitting inaccurate expense vouchers and that he often bickered and quarreled over his assignments, the Court is of the opinion that the plaintiff's discharge by the defendant was perfectly lawful.

Finally, in an attempt to show that plaintiff's discharge was unlawful, the plaintiff cites the adverse reaction of AFL–CIO affiliates to plaintiff's speech and argues that under *Anderson v. Methodist-Evangelical Hospital,* 3 EPD 8282, 4 FEP 33 (W.D.Ky.1971), *aff'd* 464 F.2d 723 (6th Cir. 1972), his discharge was illegal. However, the simple fact which distinguishes this case from *Anderson* is that in the case *sub judice* the Court finds no support for plaintiff's argument that the adverse reactions of the affiliates was to plaintiff's opposition to discriminatory practices of AFL–CIO. Their adverse reaction arose from their belief that plaintiff was ineffective as a union organizer, not because they harbored prejudice for him on account of his race or because of plaintiff's specific comments in opposition to their alleged unlawful employment practices.

Plaintiff was not terminated by the defendant because of his opposition to practices made unlawful by Title VII nor was he terminated because of his race. Therefore, judgment is hereby ordered to be entered in this case in favor of the defendant and against the plaintiff.

It is so ordered.