Zelma H. GARRETT, Plaintiff,

v.

SALUDA SHIRT COMPANY,
INC., Defendant.

Civ. A. No. 77–1856.

United States District Court,
D. South Carolina,
Greenwood Division.

Mar. 23, 1979.

Zelma H. Garrett, pro se.

Stephen Savitz, and Julian Gignilliat, Columbia, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HEMPHILL, Senior District Judge.

This case was begun in this court by filing on September 13, 1977, a complaint, allegedly instituted under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964 complaining that race and sex discrimination had been practiced upon plaintiff, Zelma H. Garrett, a black female. Processing resulted in a bench trial February 22, 1979.

In pretrial proceedings, plaintiff, through her attorney, admitted there was no official state action or action under color of state law involved in the alleged discrimination and abandoned all claims under 42 U.S.C. § 1983. Plaintiff further conceded that the six-year statute of limitations had run on 42 U.S.C. § 1981, thus negating such statute as a basis for a cause of action. Further, plaintiff admitted there was no alleged discrimination on the basis of sex and abandoned the sex discrimination claims. Plaintiff also abandoned any claim against Marion Teasley. Consequently, the only claim of discrimination remaining is one of race discrimination by plaintiff against Saluda Shirt Company, Inc., under Title VII of the Civil Rights Act of 1964.

At trial, plaintiff called Marion Teasley under Rule 611[1], Federal Rules of Evidence, and testified in her own behalf. Defendant also called Mr. Teasley as well as Marie C. Glover, a black former employee, Virginia Corley, a sewing machine operator in "Collars and Cuffs", Doris Miller, Mrs. Garrett's supervisor when she was an employee, and Ellen W. Jennings, Supervisor with the Columbia Office of the Social Security Administration (to authenticate the records of the Administration).

Plaintiff, Zelma H. Garrett, is a black female. She has had some courses and experience in operating a sewing machine, and applied to the defendant, Saluda Shirt Company, Inc., for employment in late 1971. Plaintiff was hired[2] as a sewing machine operator by Saluda Shirt Company, Inc., in January, 1972, and was placed on a piece-rate basis as are all sewing machine operator employees; she was guaranteed at least minimum wage. She was employed for twenty-three (23) weeks by Saluda Shirt Company, Inc., and was usually responsible for collar quilting. Like all other machine operators, Mrs. Garrett had to be available to work on other operations when production required.

On June 16, 1972, Plant Manager Teasley terminated the plaintiff's employment with Saluda Shirt Company, Inc. Mr. Teasley testified that all employees in Mrs. Garrett's section work on a piece-rate basis.[3] They were all guaranteed minimum wage, but if they worked to "production" standards, they would make more than minimum wage. He testified that he used recognized methods of time study to determine piece-rate bases. Some pieces of cloth are more difficult to work with than others and, therefore, require a fewer number of pieces completed in order to result in the same pay at the end of the day as would be required with an easier material with which a person has to work. Teasley testified that during the first part of her employment, Mrs. Garrett did a good job, but her work production and attitude deteriorated the longer she was with the company. He detailed overtime as a condition of employment with the company and that Mrs. Garrett agreed to work overtime when hired. Further, the first five (5) times plaintiff was asked to work overtime, she cooperated. However, the last three (3) times she was requested to work overtime, she refused. Teasley stated that plaintiff, during her final week of employment, complained of the amount set for her piece rate; he told her that he would get back to her as soon as one of his supervisors returned from summer camp. Later that week the final confrontation occurred which resulted in Mrs. Garrett's termination before he could confer with the absent supervisor. Mr. Teasley's testimony was that on Friday, June 16, 1972, he walked by Mrs. Garrett's desk, said "good morning" to her, and that she immediately began to complain about her rate of pay. Her voice became louder and louder and he attempted to calm her down. At one point he told her in an effort to calm Mrs. Garrett that he was pleased with her work. She replied, "I could care less whether you are satisfied with my work!" He testified that since he was solely responsible for quality and production standards at the plant, he could not tolerate any employee who had an attitude as there exhibited. He told her to clock out and terminated her for insubordination. Teasley testified that so far as he knows, all work is assigned solely on a non-discriminatory basis in order to meet production standards.

Mrs. Garrett testified that work which would have been profitable to her was tak-

---

1. Rule 611(c) provides: Mode and Order of Interrogation and Presentation

    (c) Leading questions.... When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

2. Mr. Teasley testified that when she came to the office in 1972 and was interrogated by him as to her health, etc., he found her satisfactory and "hired her right then and there." (This was revealed on examination by plaintiff's counsel.)

3. This was corroborated by all witnesses in the case who had knowledge of the workings of the plant.

en and given to white employees and black employees. She also testified that she believed some white women were given "better work" and that she received their work only when she was caught up, but could not name any of those people nor present any evidence as to whom they may be. She did name the two black women who received her work as Janie Bonham and Marie "Bibi" Glover. Mrs. Garrett testified that she minded her own business and did not disturb others but this was not credible in view of the credible statement of her co-workers that she frequently talked to them. She further testified that June 16 was the first time that she refused to work overtime. As to the incident resulting in her termination, she denied that she ever made the statement, "I could care less whether you are satisfied with my work." Mrs. Garrett did admit that she received Supplemental Security Income (SSI) from the Social Security Administration. Plaintiff never admitted that she had a mental disability but did admit that at least two (2) doctors said that she was mentally ill.[4] Further, the records before this court indicate that plaintiff does, in fact, receive Supplemental Security Income (SSI) because of her mental disability. She admits not signing the applications for SSI, she stated that she does not recall answering any of the questions on the application. At least one application states that she has been disabled because of this disability since June 15, 1972, the day before she was terminated. Further, she testified that as far back as 1966, she was a patient of the South Carolina State Hospital diagnosed as manic depressive. Her present diagnosis is paranoid schizophrenia.

Mrs. Marie Glover testified that her machine was immediately in front of Mrs. Garrett's while they worked at Saluda Shirt Company, that she was not aware of any discrimination in work assignments, but it was her feeling that work was assigned to everyone equally. She further stated that at least one time she advised Mr. Teasley that if she were not moved from in front of Mrs. Garrett that she would quit because Mrs. Garrett was disturbing her so often during work time. She was present the day that Mrs. Garrett was terminated and vividly remembered Mrs. Garrett becoming so loud that people stopped working in order to turn around and see what was happening. She remembers Teasley trying to "calm plaintiff down" but did not listen to the entire interchange.

Mrs. Virginia Corley was also present on the day of June 16, 1972, and her recollection supports that of Mr. Teasley and Mrs. Glover.

Mrs. Doris Miller, Zelma Garrett's supervisor, also testified she was the person actually responsible for assigning work to employees. Mrs. Miller's testimony was that in no case was race ever considered in assignment of work. Simply, there is a production schedule, and work is assigned in order to maximize the number of finished products in the shortest amount of time.

This court has before it the payroll cards of all employees working in Mrs. Miller's section in 1972. Under cross examination, Teasley identified all of the employees as to race. In reviewing these payroll records, this court can find no evidence whatsoever that white employees in general were paid any more than black employees in general. There is no credible evidence before this court which would support any allegation of race discrimination. The only evidence before this court is that sewing machine operators must continually be willing to accept different sewing assignments to keep the plant operating at maximum efficiency and that production requirements and the work available are the sole criteria used to determine whether an employee is transferred from one job to another and/or one department to another.

---

4. On cross examination she admitted she had been diagnosed as mentally ill and designated a paranoid schizophrenic. When she was in the South Carolina State Hospital for 4½ months in 1966 the diagnosis included, "she seems to be unable to distinguish fantasy from reality." Her testimony in the bench trial before this court bore all the characteristics of one having a persecution complex.

Upon the credible evidence before it this court publishes its

### FINDINGS OF FACT

1. Plaintiff is a black female who was hired by Saluda Shirt Company in January, 1972, and was placed on a piece-rate basis as are all sewing machine operator employees and she was guaranteed at least minimum wage.

2. Plaintiff agreed as a condition of employment to work overtime when necessary. She was employed for a total of twenty-three weeks by Saluda Shirt Company, Inc. She cooperated with employer by working overtime the first five times she was asked, including her first three weeks of employment, but refused to work overtime the last three times she was requested, including the week of termination.

3. The "base rate" for employees making 100% of production is substantially higher than the minimum. Her payroll records reflect that her performance deteriorated sharply in the last eight weeks of her employment.

4. Assignment of work at Saluda Shirt Company was based on a production system in order to maximize efficiency. There is no evidence that assignment of work was based on racial discrimination, and there is no evidence that her discharge was motivated by racial discrimination. The work force at Saluda Shirt Company, Inc. is racially mixed and shows no evidence of discriminatory placement.

5. The plaintiff made substantially the following statement to Marion Teasley, Plant Manager: "I can care less whether you are pleased with my work."[5]

6. Plaintiff is a diagnosed schizophrenic, paranoid type, and is receiving disability income from the Social Security Administration based solely on her mental disability. Plaintiff has been disabled since at least the date of termination from employment by Saluda Shirt Company, Inc.

7. Plaintiff is unable to work because of her disability and has been unable to work since at least the day of her termination from employment.

### CONCLUSIONS OF LAW

A. This court has jurisdiction of this action only as to Saluda Shirt Company, Inc. and only as to race discrimination under Title VII of the Civil Rights Act of 1964 and jurisdiction of defendant by virtue of service. Her work, attitude and interest were not satisfactory. It is not the function of the court to determine whether a decision is wise, for an employer has not violated Title VII if its discharge of a black employee was for a lawful reason. *Doe v. AFL–CIO*, 405 F.Supp. 389, 537 F.2d 1141, *cert. den.* 429 U.S. 1102, 97 S.Ct. 1127, 51 L.Ed.2d 552 (D.C.Ga.1975). See also *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); and *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

B. Plaintiff has not established the necessary prima facie case of discrimination in her work assignments or discharge. Consequently it is found that the discharge was lawfully motivated.

C. Defendant has conclusively demonstrated by credible evidence that assignment of work was based on a non-discriminatory basis, i. e., to increase efficiency and maximize production.

D. Defendant has also conclusively demonstrated that the cause for discharge was not racially motivated but rather was because of insubordination.

E. Even if this court had determined plaintiff had been discriminated against by her discharge, no relief could be granted because:

(1) Plaintiff cannot be reinstated because of her disability, and she has not suffered lost wages because she has been unable to work since the day before her discharge.

---

**5.** Teasley testified: "I did not fire her for not working overtime." "I did not fire her for not doing quality work." "I fired her for telling me she could care less whether we liked her work"

—"None of the work was assigned on the basis of race"—"assigned on the basis of production requirements."

(2) Records before this court contain the analysis by Charles E. Levy, M.D., Psychiatric Consultant, to the Social Security Administration Bureau of Disability Insurance dated May 7, 1975, which reads in part "however in view of her history of violent behavior and her current suspiciousness and delusional thinking, I conclude that the stress of a work situation would precipitate another episode of overt schizophrenic illness." As late as May 31, 1976, Mrs. Garrett's physician approved the following language:

> Medical evidence shows that she is continuing to be seriously ill from the mental standpoint. She continues to express delusional material, is largely incoherent and incompetent. She continues to be quite confused. It is determined disability is continuing.

(3) So long as she is receiving these benefits and is disabled, plaintiff is unable to work and cannot be reinstated.

(4) The plaintiff could not have worked during the entire period of her disability which extends at least to the day that she was terminated and is, therefore, not entitled to back wages. It is well settled in employment discrimination cases that back-pay is not owed for periods in which a person is ill or otherwise incapacitated and cannot work. *Airports Service Lines, Inc.,* [231 NLRB No. 137 (1977)] 96 LRRM 1358, *Mastro Plastics Corp.,* 136 NLRB 1342 (1962), *Associated Transport Co.,* [194 NLRB 62 (1971)] 78 LRRM 1678. Title VII provides in part:

> Interim earnings or *amounts earnable* with reasonable diligence by the person or persons discriminated against shall operate to reduce the back-pay otherwise allowable. (42 U.S.C. § 2000e–5(g).) [Emphasis added.]

The guiding principle is that the remedial intent of Title VII is to make the victim of discrimination whole. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Because of plaintiff's mental incapacity during the entire period of her unemployment, a "back-pay" remedy would not contribute to making her whole,

even if she had been discriminated against. Thus, the remedy of back-pay is not available to the plaintiff in this action. *EEOC v. N. Y. Times Broadcasting Service, Inc.,* 542 F.2d 356, 12 EPD § 11,205 (6th Cir. 1976). *EEOC v. Steamfitters Local 638,* 542 F.2d 579 (2nd Cir. 1976), *Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026, 14 EPD § 7511 (6th Cir. 1977), *Kinsey v. Legg Mason Wood Walkers, Inc.,* 16 EPD § 8168 (D.D.C.1978).

IT IS THEREFORE ADJUDGED AND DECREED that for the reasons set forth above, plaintiff shall take nothing, and that the action is hereby dismissed.

AND IT IS SO ORDERED.