Peter W. GUILDAY, Plaintiff,

v.

DEPARTMENT OF JUSTICE et al., Defendants.

Civ. A. No. 4578.

United States District Court, D. Delaware.

Jan. 31, 1980.

---

Robert F. Stewart, Jr. of Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for plaintiff.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., Barbara Allen Babcock, Asst. Atty. Gen., Anthony J. Steinmeyer and Paul A. Gaukler, Dept. of Justice, Washington, D. C., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

In this non-jury action, Peter W. Guilday, the plaintiff, seeks retroactive promotions, back pay, interest, attorneys' fees and costs[1] from Leonel J. Castillo, Commissioner of the United States Immigration and Naturalization Service ("INS"). Guilday alleges that INS improperly retaliated against him, rejecting his promotion, for filing with INS an administrative complaint of racial and religious discrimination. Guilday initially sought redress for this alleged

discrimination as well.[2] On June 20, 1978, this Court dismissed the discrimination issues on procedural grounds.[3] Presently before this Court, which heard this case during a week long trial, are both parties' petitions for judgment, along with proposed findings of fact and conclusions of law submitted in support thereof. Since the record discloses that Guilday's employer retaliated against him, this Court finds that he should be promoted and paid retroactively. The following opinion constitutes this Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

■ The legal basis for Guilday's claim is the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1971). Although originally applicable only to the private sector, this statute was later extended to cover federal employees by the Equal Employment Opportunity Act of 1972. 42 U.S.C. § 2000e–16. Together these statutes prohibit federal agencies from retaliating against their employees for filing discrimination complaints, otherwise, federal employees might be deterred from bringing valid suits to eliminate vestigal discrimination. *Williams v. Boorstin*, 451 F.Supp. 1117 (D.D.C.1978); *Ayon v. Sampson*, 547 F.2d 446 (9th Cir. 1976). Possible remedies include the award of retroactive promotion and raises, *Richerson v. Jones*, 551 F.2d 918 (3d Cir. 1977), necessary to place an employee in as good a position as he would have assumed but for the retaliation. 42 U.S.C. § 2000e–16(d); 42 U.S.C. § 2000e–5(g). *Mead v. U. S. Fidelity & Guaranty Co.*, 442 F.Supp. 114 (D.Minn. 1977).

■ Over the years, courts evolved a special system for allocating burdens of proof in the highly subjective field of employment discrimination. Under these procedures, Guilday must first make out a *prima facie* case of employment retaliation. *Ostapowicz v. Johnson Bronze Company*, 541 F.2d 394 (3d Cir. 1976). This is done by proving

---

**1.** Plaintiff's Post Trial Brief, pp. 41–45.

**2.** Pleading Paper 1.

**3.** Pleading Papers 99 and 101.

that: (1) he participated in the protected activity (filing a discrimination complaint); (2) the employer knew of this participation; and (3) following this participation, he was denied a promotion within such a period of time and in such manner that the Court can infer retaliatory motivation. *Brown v. Biglin*, 454 F.Supp. 394, 399 (E.D.Pa.1978); *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318, 324 (D.Mass.1976). If Guilday establishes a *prima facie* case, the burden of proof shifts to the defendant which may defend itself either by showing that no retaliatory motive ever existed, or that it was insignificant. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Rogers v. E. E. O. C.*, 179 U.S.App.D.C. 270, 551 F.2d 456 (D.C. Cir. 1977); *Ostapowicz v. Johnson Bronze Company*, 541 F.2d 394 (3d Cir. 1976); *Day v. Mathews*, 174 U.S.App. D.C. 231, 530 F.2d 1083 (D.C. Cir. 1976); *E. E. O. C. v. E. I. du Pont de Nemours & Co.*, 445 F.Supp. 223 (D.Del.1978); *Beckwith v. Hampton*, 430 F.Supp. 183 (D.D.C.1977); *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 427 F.Supp. 318 (D.Mass.1976); *Doe v. AFL–CIO Dept. of Organization Region 6*, 405 F.Supp. 389 (N.D.Ga.1975).

Guilday began working for INS on June 26, 1961.[4] All went well until July 30, 1968, when Guilday, a white Christian,[5] filed a complaint that INS favored Blacks and Jews in promotion to desirable positions.[6] In August, 1972, he filed a similar charge and he also complained that INS retaliated against him for filing his previous complaint.[7] On February 5, 1974, he filed another complaint alleging retaliation only.[8] INS hearing officers ultimately decided all these complaints against Guilday [9] who then brought this action.

As these complaints were being decided, plaintiff's supervisors evaluated his performance. INS supervisors routinely evaluated their workers during the last months of any calendar year.[10] If a worker requested, in order to be considered for certain jobs, his supervisors would evaluate him more often.[11] In any evaluation, a worker's immediate supervisor and his next higher supervisor [12] would rate him. Supervisors used two INS forms: "Basic" and "Supervisory Performance or Potential".[13] Each such form allowed the supervisor, by checking a box and commenting about the employee, to make a recommendation regarding advancement of which there were three possibilities:

[ ] A. I highly recommend him for promotion at this time for the reasons set forth under comments below.

[ ] B. I recommend him for promotion.

[ ] C. I do not recommend him for promotion at this time for the reasons set forth under comments below.

COMMENTS: (Use separate sheet if necessary).[14]

Subsequent pages then required an employee's supervisors to characterize certain of the employee's work habits and traits checking columns labelled "very good", "good", "fair" or "don't know".[15]

Almost without exception, plaintiff's supervisors used his basic appraisal form to

4. Pre-Trial Order, Stipulation 1.

5. Plaintiff's Exhibit 1, p. 4.

6. The Administrative Record was introduced as Plaintiff's Exhibit 1.

7. The Administrative Record was introduced as Plaintiff's Exhibit 2.

8. The Administrative Record was introduced as Plaintiff's Exhibit 3.

9. Plaintiff's Exhibit 1, p. 6; Plaintiff's Exhibit 2, pp. 25–26; Plaintiff's Exhibit 3, p. 4.

10. Pre-Trial Order, Stipulation 5; Trial Transcript p. A10.

11. Trial Transcript, p. A10.

12. *Id.*

13. Pre-Trial Order, Stipulation 5.

14. *See e. g.*, Plaintiff's Exhibit 4.

15. Plaintiff's Exhibit 4.

"highly recommend" him for promotion.[16] On his supervisory appraisal form, however, they often checked Box B. One such official was Vernon Spangrud, plaintiff's immediate supervisor from November 4, 1968 through 1972, and his next higher supervisor from 1972 through 1975.[17] Another was Joseph P. McFadden, Guilday's immediate supervisor from July 1, 1973 through 1975, and his next higher supervisor from 1976 through September 25, 1977.[18] Spangrud checked Box B on all supervisory appraisals prepared during 1970 through 1973,[19] while McFadden checked Box B on supervisory appraisals dated December 7, 1973 and April 8, 1974.[20] Plaintiff claims to have received these only mediocre ratings in retaliation for complaining of discrimination.

Guilday particularly cites McFadden's comment upon Guilday's supervisory appraisal form dated December 7, 1973: "Mr. Guilday has the energy and ability to be a supervisor. However, his present suit against the Service, while defnitely (sic) not affecting his work, is inconsistent with the attitude needed to be a supervisor and precludes me from highly recommending him for a promotion to supervisor." [21] Guilday also cites Spangrud's comment upon a supervisory appraisal, dated December 12, 1974:

It is my recollection that in my appraisals of Mr. Guilday in prior years, I have always "recommended" him for promotion to a supervisory position and felt that they were honest appraisals. The primary reason as to why I never "highly recommended" him in the past was that Mr. Guilday was quite vocal in making known his complaint that h? has not been treated fairly by the promotion policies of this Service because of Civil Rights complaints that he has filed. I disagree completely with Mr. Guilday's prior beliefs

that he was being persecuted because of race or religion and feel that he has not always promoted good morale and pride in the Service through the voicing of his feelings to his fellow workers. There is also the possibility that he has not always projected a favorable Service image through public voicings of his beliefs. It appears that Mr. Guilday may have resolved his differences with this Service's promotion policy and as he continues to be a high production officer, continues to be readily available to take on any assignment given him, is well liked by his fellow workers, and sets a good example as a hard worker, I feel that he is now capable of taking on assignments of greater difficulty and responsibility, including those of a supervisory nature. Mr. Guilday received a sustained superior performance award in 1970 for his excellent production record.[22]

This evidence clearly establishes a *prima facie* case of retaliation. Guilday filed civil rights complaints of which his supervisors were aware. His supervisors then prepared mediocre, rather than good or excellent, evaluations of Guilday's work. Their comments, tying together Guilday's mediocre rating and his civil rights complaints, indicate that the two events probably were related.

Defendant, however, claims that Guilday's mediocre rating was not retaliatory but was exactly what he deserved. Both McFadden [23] and Spangrud,[24] claimed that Guilday failed to demonstrate adequate technical knowledge. Spangrud explained that during late 1973, Guilday had worked on projects requiring more formal reporting. Several times thereafter, Amos Edens, Guilday's immediate supervisor, advised Spangrud that Guilday's writing was unsat-

**16.** Plaintiff's Exhibits 4–7.

**17.** Plaintiff's Exhibit 4.

**18.** Trial Transcript, p. A14; Plaintiff's Exhibit 5.

**19.** Plaintiff's Exhibit 4.

**20.** Plaintiff's Exhibit 5.

**21.** Plaintiff's Exhibit 5(b).

**22.** Plaintiff's Exhibit 4(L).

**23.** Trial Transcript, pp. C28, C33–C38.

**24.** Trial Transcript, pp. D15–D17.

isfactory.[25] McFadden and Spangrud also testified that Guilday failed to display the dedicated attitude of a leader. Guilday sometimes derided INS policies over coffee or during bi-weekly staff meetings which INS recruits attended.[26] In addition, McFadden testified that Guilday showed a poor leadership attitude by scrawling something like—"I don't even know why I bother filling out these applications or applying for the job as this promotion policy is a complete farce"—across a form requesting McFadden to prepare an appraisal.[27]

Defendant claims that these deficiencies alone caused McFadden and Spangrud to give Guilday only a mediocre rating. This testimony, however, contradicts the plain meaning of the appraisal comments quoted above. Moreover, it came from witnesses who, perhaps because it is their allegedly retaliatory acts which fuel this case, seem untruthful. At any rate, McFadden's initial evaluation failed to mention Guilday's alleged difficulties in writing reports. When the INS Commissioner investigated this evaluation, however, McFadden cited Guilday's technical knowledge as the "first and principle [sic] reason" for his mediocre evaluation. Guilday's allegedly poor attitude, though mentioned, was assigned only secondary importance.[28] INS later concluded that McFadden had not retaliated against Guilday, but INS requested that McFadden submit a new evaluation clarifying his reasoning.[29] This evaluation failed to mention Guilday's attitude,[30] complaining instead of his technical skills. At trial McFadden initially focused on Guilday's technical skills,[31] but when confronted with his earlier statements, McFadden shifted his testimony, claiming that "it's almost a fifty-fifty balance" between attitude and technical skills.[32]

McFadden also changed his testimony regarding his claim that Guilday stated that the INS promotion policy was a "farce". McFadden initially claimed that this remark appeared on Guilday's INS Form 602 Request for the preparation of his December, 1973 supervisory evaluation.[33] This form, however, contained no such statement.[34] McFadden then stated that Guilday must have made the "farce" remark in some other document.[35] Significantly, though, this alleged document was not produced or cited at trial.

Spangrud and McFadden's testimony also fails to comport with that of Guilday, who appeared honest and forthright. He testified that the only technical problems his superiors ever complained about were minor writing flaws,[36] very similar to the things Edens's superiors complained about just before promoting him.[37] Only one appraisal, McFadden's April 8, 1974 supervisory appraisal, in fact denigrated Guilday's report writing skills.[38] This lone appraisal may be untrustworthy since McFadden was then seeking to justify Guilday's mediocre evaluation. Indeed, during February, 1974, McFadden promised Guilday that if he pursued his complaint, McFadden would seek to justify his mediocre evaluation by unfair-

25. *Id.*

26. Trial Transcript, pp. D12–D13.

27. Trial Transcript, pp. C23–C32.

28. Plaintiff's Exhibit 3, pp. 7–8.

29. *Id.*, pp. 4–6; INS also instructed McFadden to inform Guilday that the inartistically phrased appraisal would be immediately removed from his promotion folder. The offending appraisal, however, remained therein until after October, 1976, when an INS attorney working on this suit personally removed it. Trial Transcript, p. A62. *Id.*, p. B39.

30. Plaintiff's Exhibit 5(c).

31. Trial Transcript, p. C129.

32. Trial Transcript, p. C128.

33. *Id.*, p. C25.

34. Plaintiff's Exhibit 19.

35. Trial Transcript, pp. C86–C88.

36. Trial Transcript, pp. A24–A32; E36, E39–E44.

37. *Id.*, pp. E37–E38.

38. Plaintiff's Exhibit 5(c).

ly denigrating Guilday's report writing skills.[39]

Most importantly, however, the explanations offered by Spangrud and McFadden are inconsistent with other contemporary appraisals. All of these other appraisals highly recommended Guilday for promotion and many praised his efforts. Even Spangrud remarked about Guilday's excellent productivity, his high productivity rating, his value, his energy ("one of the hardest working employees" Spangrud ever encountered), his dedication, his refusal to shirk "from any assignment given him regardless of the degree of difficulty or the amount of hardship imposed", his excellent record, his popularity among his fellow employees, his assistance in training new investigators, and the prestigious Sustained Superior Performance Award that he won in 1970.[40] Similarly, McFadden praised Guilday's conscientiousness, his hard work and dedication ("an invaluable asset"), his productivity, his strong interest in self-improvement, his "boundless" energy, his ability, his diligence, his good example to trainee and junior officers, his knowledge, his ambition, his assistance to fellow officers, his competence, his able reporting, his motivation, his experience, his intelligence, his efficiency, his pleasant personality, and his ability to inspire trust.[41] Raymond Morris cited Guilday's analytical mind, his patience and his insight.[42] E. J. Wildblood, Jr. cited Guilday's high productivity and his "well-*deserved* sustained superior performance award".[43] Mitchell Solomon praised Guilday's production, his long hours on the job, his willingness to work and his fine efforts.[44] Robert A. Hallowell cited Guilday's good dress, his constructive suggestions, his businesslike manner, his conscientiousness, his hard work, his ability to investigate all

assigned cases, his excellent rapport with all whom he met, his responsiveness, his education, his experience, and his willingness to perform any assignment.[45] Raymond Penn praised Guilday's conscientiousness, his hard work, his ability to investigate all assigned cases, his excellent rapport, his willingness to accept any assignment, his education and his experience.[46]

Guilday's attitude is mentioned in at least eight other appraisals, which show that his complaints never interfered with his work. As early as December, 1970, E. J. Wildblood commented in a supervisory evaluation, "In spite of long continuing career frustrations, Mr. Guilday has performed his duties with interest and enthusiasm. He is constantly attempting to improve his technical knowledge and has made marked progress in this regard." [47]

On December 16, 1971, Spangrud prepared a basic appraisal saying:

> Investigator Guilday is an intelligent officer who I feel could easily handle duties of greater responsibility. Although he often expresses dissatisfaction with this Service's promotion policies and feels that he and his fellow officers are grossly under-rated in comparison to other agents, this does not deter him from accomplishing his assignments and he consistently maintains one of the highest production rates in the Inv. Branch of the Philadelphia office.[48]

"This officer has the ability and know how to handle any investigative action and do it very well," commented Solomon in a basic appraisal prepared during January, 1972. "He has been a production leader for several years and has shown he has ability to take over responsibilities if he will only

39. Trial Transcript, pp. A22–A25.

40. Plaintiff's Exhibit 4.

41. *Id.*, 5.

42. Plaintiff's Exhibit 6.

43. *Id.*, 7(a).

44. *Id.*, 7(g).

45. *Id.*, 7(i), 7(j), 7(k).

46. *Id.*, 7(m).

47. *Id.*, 7(b).

48. Plaintiff's Exhibit 4(c).

confine himself to his work and follow service policies."[49]

On September 19, 1972, Solomon commented on Guilday's basic appraisal:

This officer has been a production leader in his work for a number of years. He has the ability and the know how to handle all investigative actions. He has shown he can take responsibilities when he wants to. His disagreement with various service policies has not interfered with his production.[50]

Solomon's supervisory appraisal of Guilday, prepared on September 19, 1972, said, "If given supervisory responsibilities, which he has the ability to handle, Officer Guilday might then realize the necessity of carry in (sic) out Service Policies."[51] Three months later, Spangrud wrote in a basic appraisal:

I find in Investigator Guilday a tireless employee who will not shirk from any assignment given him regardless of degree of difficulty or hardships imposed. He continues to be a highly productive investigator despite his disagreements with Service policies, especially in regard to promotion policies.[52]

McFadden's October, 1976 supervisory appraisal comment said:

Mr. Guilday is a seasoned employee with a wealth of experience accrued through his career as a Border patrolman and Investigator. His oral and written reports reflect that he has the ability to analyze problems and apply sound judgment in seeking their solutions and their future prevention. I have only rated Mr. Guilday as—fair—in the blank entitled "Capacity for supervisor assignment" as he is apparently dissatisfied with his present position and has not demonstrated leadership initiative or an effort to increase knowledge and skills. If he should be promoted to a position wherein he feels that the grade level is correct

and that he is doing a necessary and important job, I am sure that he could and would do an outstanding job.[53]

Finally, in December, 1976, McFadden wrote in a supervisory appraisal:

Mr. Guilday is a seasoned Investigator well-versed in all facets of the Investigations activity. He is ambitious and interested in self-development as evidenced by his continued studies towards a masters degree on his own time and at his own expense. I am sure that Mr. Guilday could do a very competent job as a supervisor in a position where he feels that the grade level is correct and something purposeful is being accomplished.[54]

Guilday testified, without contradiction, that insofar as he was able to determine, the comments regarding attitude generally referred to his ongoing discrimination suits.[55] These comments, therefore, demonstrate that Guilday remained within proper bounds in bringing these suits. While he apparently commented to his peers about his suits, his comments only educated and sensitized his fellow workers about his concerns and their possible remedies, and did not affect INS's main mission. This type of communication is protected under Title VII. Only when such communication or other activity significantly interferes with the employer's business goals can that employer take action against the complaining employee. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hochstadt v. Worcester Foundation for Experimental Biology*, 425 F.Supp. 318 (D.Mass.1976); *E. E. O. C. v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y.1975). Since Guilday's suit did not affect the generally high quality of his work this Court holds that the defendant's claims regarding his poor attitude and work are merely pretextual and that the true explanation for his mediocre job ratings was retaliation.

---

**49.** *Id.*, 7(c).

**50.** *Id.*, 7(e).

**51.** Plaintiff's Exhibit 7(f).

**52.** *Id.*, 4(g).

**53.** *Id.*, 5(j).

**54.** Plaintiff's Exhibit 5(m).

**55.** Trial Transcript, p. A50.

In measuring the effect of that retaliation, this Court has been particularly guided by the Third Circuit's rulings in *Ostapowicz v. Johnson*, 451 F.2d 394 (1976). There, plaintiffs alleged and proved sex discrimination against an employer who allowed only male employees to train for better paying jobs. The employer also favored men by laying off females with more seniority. The Court awarded the women: (1) a wage differential between their jobs and the better paying jobs that they were unfairly denied; (2) wages lost through discriminatory layoffs; and (3) lost fringe benefits. In determining this amount, the District Court and a master were required to make a number of assumptions which the defendant challenged. The Third Circuit panel ruled:

> Absolute precision in ascertaining plaintiffs' loss under such circumstances cannot be expected. The Court must make reasonable awards based on available data.

. . . . .

We do not find the composition of the formula or its application to be erroneous. It represents a conscientious effort to calculate reasonable and equitable awards under conditions which do not allow for absolute precision.

*See also Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976); *United States v. U. S. Steel Corp.*, 520 F.2d 1043 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211 (5th Cir. 1974) [In computing a back pay award, unrealistic exactitude is not required and uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer.]

Under the INS Merit Promotion and Reassignment Plan (MPRP),[56] hiring officials staff positions by choosing from among a few applicants making a "selection list".[57] To make this list during the relevant time period, a person seeking promotion had to earn a higher "selection score" than all but two other promotion seeking people whose names also appeared on the list.[58] Much depended then on an individual's selection score. If it was too low, he was never considered for promotion. If it was high enough, he was considered among a tiny group of finalists, any one of whom could be chosen for the position.

Actually, each INS employee can have two selection scores: supervisory and non-supervisory. The former is used in staffing supervisory positions, while the latter is used for staffing non-supervisory positions.[59] The supervisory selection score is calculated by accumulating points earned in four categories: (1) supervisors' recommendations regarding advancement on the previous appraisal form; (2) an INS panel's rating regarding the overall quality of the applicant's total qualifications; (3) an INS panel's rating regarding the applicant's training and self-development; and (4) the applicant's experience at various pay levels in the INS.[60] The non-supervisory selection score is figured in the same way except that the supervisors' recommendations regarding advancement on the previous basic evaluation form are considered rather than the advancement recommendations on the previous supervisory evaluation forms.[61]

Guilday contends that his supervisors' retaliatory acts served to lower his 1974 selection scores in two says. First, his supervisors improperly marked Box B on his 1973 supervisory appraisal form.[62] As a result, Guilday obtained only eighty-five points to-

---

**56.** Plaintiff's Exhibit 8.

**57.** Trial Transcript, p. B7.

**58.** *Id.*, p. B4. INS also listed the top person seeking reassignment to the vacant position from the same "GS" level and all people seeking demotion to the vacant position. Since December, 1977, the names of seven people seeking promotion are listed.

**59.** *Id.*, p. A177.

**60.** Trial Transcript, pp. B24–B28.

**61.** *Id.*

**62.** Pre-Trial Order, pp. 17–18.

ward his selection score, rather than the one hundred points he would have received had his supervisors marked Box A. This Court accepts Guilday's argument and finds that he should have received a 1974 supervisory selection score of at least fifteen points higher than the 111 points he actually received.[63]

Guilday also argues that his supervisor's retaliation affected the number of points he received during 1974 for the overall quality of his total qualifications.[64] In fact, of a possible thirteen points Guilday received only ten, 1.6 points less than the average awarded in 1974 to a randomly selected sample of INS employees making selection lists.[65] Defendant, however, established that the supervisors' retaliatory acts did not affect this portion of the selection score. INS panels spend two days calculating these overall quality of qualification scores.[66] On the first day, panels determine their rating guidelines. On the second day they appraise each INS employee following their guidelines. The 1974 panel agreed to base its ratings on the basic, rather than the supervisory, appraisals prepared in late 1973.[67] Guilday's basic appraisals spoke well of him and highly recommended him for promotion.[68] If the rating panel followed its guidelines, Guilday would not therefore have been injured by the offending supervisory evaluations. Although INS also gave its panels the offending appraisals,[69] there was but a mere possibility that any panel member, busily working to appraise a large number of INS employees, might disregard the guidelines and consider

additional information.[70] Consequently, this Court finds that Guilday's 1973 supervisory evaluations did not affect the score he received for the overall quality of total qualifications.

Still, these appraisals lowered Guilday's 1974 supervisory selection score by fifteen points. Had these additional points been awarded, Guilday's name would have been placed upon a selection list for a GS–12 level vacancy as a supervisory customs inspector in Philadelphia.[71]

Defendant, however, claims that even if Guilday's name appeared upon this list, he would not have been selected.[72] In support of this proposition, defendant offers the testimony of Mr. Lawrence Augustine, who, as the Director of INS's Philadelphia office, staffed the vacant positions.[73] Augustine testified that he considered five factors about each candidate. He first considered a candidate's most recent supervisory appraisals, especially the latter portion in which the employee's work habits and traits are rated.[74] He next considered the breadth of a candidate's INS experience.[75]

Augustine also considered, but less importantly, both the candidate's awards and commendations and his continuing INS training,[76] including, particularly, INS correspondence course participation. Augustine regarded the latter as "a definite sign of motivation".[77] Finally Augustine considered, but only if the candidates were otherwise indistinguishable, an officer's personal improvement through continuing education or involvement in community af-

---

**63.** Pre-Trial Order, Stipulation 23.

**64.** Pre-Trial Order, pp. 19–20.

**65.** *Compare*, Pre-Trial Order, Stipulations 23 and 29.

**66.** Trial Transcript, pp. A181–A182.

**67.** *Id.*, p. B30.

**68.** Plaintiff's Exhibit 4(i); Plaintiff's Exhibit 5(a).

**69.** Trial Transcript, p. B31.

**70.** *Id.*, pp. B33–B34.

**71.** *See* Pre-Trial Order, Stipulation 25.

**72.** Defendant's Brief, pp. 49–56.

**73.** Trial Transcript, p. B76.

**74.** *Id.*, pp. B78–B80.

**75.** *Id.*, pp. B80–B81.

**76.** *Id.*, pp. B81–B83.

**77.** *Id.*, p. B82.

fairs.[78] Augustine chose Mr. Raymond Penn for the vacant position on the basis of these factors.[79]

Defendant claims that Augustine would have chosen Penn over Guilday due to Penn's superior credentials. Defendant, however, failed to produce Penn's selection folder which the INS apparently destroyed after the start of this lawsuit.[80] In contrast, plaintiff produces his folder which strongly supports his candidacy.[81] In the latter portion of the evaluations at which Augustine claimed to have looked, Guilday received eighteen "very goods", fourteen "goods", no "fairs" and no "don't knows". In addition, Guilday's experience appears very broad. After joining INS, he served as a Border Patrol Agent at McAllen, Texas, until November 1963 when he became an investigator trainee. From December, 1964 until January, 1966 he worked as a Criminal Investigator in New York City.[82] In February, 1967 Guilday became a criminal investigator responsible for the entire State of South Carolina.[83] Then, in 1967, Guilday began working as a criminal investigator in Philadelphia.[84]

Although Guilday seldom participated in INS correspondence courses,[85] he received numerous commendations for his industry and motivation, including, in 1970, the prestigious Sustained Superior Performance Award, the federal government's second highest employee award.[86] Moreover, he worked assiduously at self-improvement, taking courses at the University of Delaware leading towards a master's degree.[87]

Besides Augustine's testimony, defendant offers that of McFadden[88] and Spangrud,[89] both of whom assisted Augustine in choosing Penn. Each testified that Guilday was less capable than Penn. McFadden and Spangrud, however, are not impartial observers since it was their bad acts that fueled this case. Consequently, this Court affords little weight to their testimony, which is unsupported by any contemporaneous statements or appraisals.

Defendant finally points to several charts showing the progress through INS of Guilday's border patrol classmates and those in the class before.[90] Only about one-third of Guilday's contemporaries have yet advanced to GS–12 level or beyond. Defendants claims, therefore, that Guilday's expectations were overly high. Uncontroverted evidence, however, discloses that many of these officers refused promotions since, in doing so, they would be required to move or they would forfeit the generous overtime benefits that accompany certain jobs in the lower echelons of INS.[91] Defendant makes no showing that Guilday, who was able, industrious, ambitious, willing to move anywhere for a promotion, and who did not hold a job that was associated with substantial perquisites, should be expected to advance more slowly than his most capable peers, several of whom have advanced to GS–13 and beyond.

In sum, Guilday might well have been promoted had his name appeared upon the selection list for the GS–12 supervisory customs inspector position in Philadelphia. Accordingly, this Court orders Guilday's promotion with pay retroactive to November 10, 1974, the date when Raymond Penn, who was actually selected for this position, assumed office.

**78.** *Id.*, p. B83.

**79.** *Id.*, pp. B85–B86.

**80.** Trial Transcript, p. B72. Guilday filed this suit on February 8, 1973. Augustine reviewed Penn's folder in making his selection, between September and November, 1974.

**81.** Plaintiff's Exhibit 13.

**82.** Pre-Trial Order, Stipulation 2.

**83.** Trial Transcript, p. E31.

**84.** Pre-Trial Order, Stipulation 2.

**85.** Plaintiff's Exhibit 2, pp. 105–6.

**86.** Trial Transcript, pp. E31–E34.

**87.** Plaintiff's Exhibits 4–7.

**88.** Trial Transcript, pp. C56–C62.

**89.** *Id.*, pp. D17–D21.

**90.** Defendant's Exhibits 4 and 5.

**91.** Trial Transcript, pp. E51–E56.

Guilday also claims that by failing to be promoted to GS–12 in November, 1974, he missed a subsequent promotion to GS–13. On this issue, defendant again offers the charts showing the progress of Guilday's contemporaries. As noted above, this Court finds these charts to be of little value. They do show, however, that since 1969, when INS adopted the MPRP, GS–12 level agents who entered the INS with Guilday generally spent thirty months at the GS–12 level.[92] Defendant also offers charts showing that investigators promoted to GS–12 after 1969 received their next promotion after fifty-two months in New York,[93] twenty-eight months in Chicago,[94] thirty months in Los Angeles[95] and twenty-four months in Philadelphia.[96] Where the relevant events concerned INS's Philadelphia office, the Philadelphia statistics are the most probative. Accordingly, this Court finds that Guilday should have been promoted on November 10, 1976 to a GS–13 level position, two of which were staffed by promoting GS–12 level investigators during the preceding twenty-four months period,[97] and orders his promotion with pay retroactive to November 10, 1976.

 Plaintiff also seeks interest on his award. Unless the payment of interest against the United States is specifically allowed by statute, it must be denied. *United States v. Tillamooks*, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951). This Court has not found, nor has plaintiff cited, any provision in Title VII permitting the taxing of interest against the United States. Consequently, this claim is denied. *See Richerson v. Jones*, 551 F.2d 918, 925 (3d Cir. 1977). *E.E.O.C. v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y.1975).

Consistent with the statutory policy of encouraging individuals to protect Title VII rights, plaintiff's counsel will also be allowed reasonable attorneys' fees and costs upon proper application to the Court. 42

U.S.C. § 2000e–16(d); 42 U.S.C. § 2000e–5(k).

Submit Order.

---

**92.** *See* Defendant's Exhibits 4 and 5.

**93.** *Id.*, 7(a).

**94.** *Id.*, 7(b).

**95.** *Id.*, 7(d).

**96.** *Id.*, 7(c).

**97.** Defendant's Exhibit 7(c).